**RICHMOND MEDICAL CENTER FOR WOMEN et al., Plaintiffs,**

v.

**Jim GILMORE et al., Defendants.**

**No. Civ.A. 3:98cv309.**

United States District Court,
E.D. Virginia,
Richmond Division.

July 16, 1999.

Simon Heller, Bebe J. Anderson, Karen Raschke, The Center for Reproductive Law & Policy, New York City, Dara Klassel, Planned Parenthood Federation of America, New York City, for plaintiffs.

Mark L. Earley, Attorney General of Virginia, Willaim H. Hurd, Office of the Attorney General, Richmond, VA, for defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

This action calls into question the constitutionality of the Virginia statute, Va.Code Ann. § 18.2–74.2 (the "Act"), which proscribes as criminal so-called "partial birth abortions," interpreted by the Commonwealth to mean the abortion procedure known as intact dilation and extraction and all potential variants thereof. The Commonwealth defends the Act first by arguing that the procedures which it proscribes are not really abortions, but rather "infanticide" and, on that rationale, argues that the constitutionality of the Act is not to be measured against the decisions of the Supreme Court of the United States which define the constitutional parameters of state abortion laws. See Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and Planned Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Alternatively, the Commonwealth asks the Court to disregard Roe and Casey by applying them in a fashion that has been rejected by eighteen of the nineteen decisions to have addressed partial birth abortion statutes in other States.

As will be seen, these defenses of the Act ignore the fundamental fact that the Supreme Court is the ultimate authority on the interpretation of our Constitution and laws, and thus its decisions control the determination whether a State abortion law is repugnant to the United States Constitution. Under our form of government, all lower federal courts must adhere to the Supreme Court's controlling decisions. And, that is true even where, as here, the State law touches on deeply-held moral beliefs or implicates the twin concerns of federalism and comity.

Plaintiffs, Virginia physicians, medical clinics, and nonprofit corporations offering reproductive health services and obstetrical and gynecological medical services, including abortions, brought this action against the defendants, the Governor of Virginia and six Commonwealth's Attorneys, seeking preliminary and permanent injunctive relief and a declaration that the Act offends the Constitution of the United States in several ways. The individual and institutional plaintiffs brought this action on their own behalf and on behalf of their patients seeking abortions.

Before the Act took effect on July 1, 1998, the Plaintiffs sought preliminary injunctive relief, which the Court granted. See Richmond Medical Center for Women v. Gilmore, 11 F.Supp.2d 795 (E.D.Va. 1998). A judge of the United States Court of Appeals for the Fourth Circuit stayed the preliminary injunction order pursuant to Fed.R.App.P. 8. See Richmond Medical Center for Women v. Gilmore, 144 F.3d 326 (4th Cir.1998). A panel of the Court of Appeals then denied, without opinion, the Plaintiffs' motion to vacate that stay, and the parties subsequently convened for a two-day bench trial on the Act's constitutional merits. The parties have agreed that the record shall be comprised of the transcript of that hearing and that of the hearing on the preliminary injunction, cer-

tain exhibits and affidavits presented at both hearings and certain deposition testimony.[1]

Upon review of the complete record and, for the reasons set forth more fully below, the Court finds that the Plaintiffs have standing to maintain this action; that, on the merits, the Act infringes upon the fundamental abortion right recognized in *Roe,* as reaffirmed and refined in *Casey;* and, finally, that the Act is impermissibly vague in violation of the Fourteenth Amendment's Due Process Clause.

## I. STATEMENT OF FACTS

### A. THE PARTIES

Plaintiff William G. Fitzhugh, M.D., is a physician licensed to practice medicine in Virginia and is board-certified in obstetrics and gynecology. He is the Medical Director of the Plaintiff Richmond Medical Center for Women, and he is an associate professor of obstetrics and gynecology at the Medical College of Virginia, Virginia Commonwealth University, in Richmond, where he instructs residents, medical students, and interns. Dr. Fitzhugh performs abortions as late as twenty weeks of pregnancy, as measured from the first day of the woman's last menstrual period ("lmp"). He first began providing abortions early in his residency, in 1969, and, he estimates that, since then, he may have performed as many as 100,000 abortion procedures. (P.I.Tr. at 108–09.)[2] Dr. Fitzhugh primarily performs abortions by the medical, suction curettage, and the dilation and evacuation methods, though he

is familiar with all commonly employed techniques.

Plaintiff Herbert C. Jones, M.D., is a physician licensed to practice medicine in Virginia. Like Dr. Fitzhugh, Dr. Jones is board-certified in obstetrics and gynecology. Dr. Jones maintains a private office in Charlottesville, Virginia, where he performs abortions; he also works as a consultant and Medical Director for the Planned Parenthood of Roanoke, Richmond, and Falls Church, Virginia. In addition, Dr. Jones teaches abortion procedures to residents at the University of Virginia School of Medicine, where he is a Clinical Assistant Professor of Obstetrics and Gynecology. He is the former chief of Obstetrics/Gynecology at, and presently is on the staff of, the Martha Jefferson Hospital in Charlottesville. Dr. Jones estimates that he has performed nearly 30,000 abortions in his career. He presently performs abortions up to twenty weeks lmp, most often using the medical induction, suction curettage, and dilation and evacuation techniques. (P.I.Tr. at 154–55.)

The institutional plaintiffs, Richmond Medical Center for Women, Hillcrest Clinic, Ltd., Virginia League for Planned Parenthood, and Planned Parenthood of the Blue Ridge, all provide first-trimester abortions and other reproductive health services and obstetrical and gynecological medical services to women around the Commonwealth. In addition, Plaintiff Hillcrest Clinic refers women seeking abortions after the first trimester to providers in Richmond and locations outside

---

1. The transcript of the preliminary injunction hearing shall be cited as "P.I.Tr. at _____." The transcript of the bench trial shall be cited as "Tr. at _____." Citations to the post-trial oral argument shall be denoted "Tr.2d at _____." Other exhibits, including the depositions tendered, are referred to as "Pls.' Ex. _____" or "Defs.' Ex. _____."

  The deposition of Dr. Charles deProsse respecting his interpretation of the Act was offered by the Defendants and objected to by the Plaintiffs under Fed.R.Evid. 702. Dr. de-

Prosse is not an expert in statutory interpretation and his opinion on that issue is not helpful to the finder of fact. Hence, the objection is sustained.

2. Because Dr. Fitzhugh does not maintain records covering his thirty-year span, the estimate is a gross one. However, because much of Dr. Fitzhugh's practice has been the providing of abortions, it is safe to say that, over the past thirty years, he has performed many tens of thousands of abortions.

Virginia.[3]

Defendant Jim Gilmore is the Governor of Virginia and is responsible for ensuring that the laws of Virginia are faithfully executed. He is sued in his official capacity. The other six defendants are Commonwealth's Attorneys for the County of Albemarle, the County of Fairfax, the City of Newport News, the City of Norfolk, the City of Richmond, and the County of Roanoke. They are responsible for prosecuting violations of Virginia's criminal statutes, and they, too, are sued in their official capacity.[4]

The Plaintiffs contend that the Act, by virtue of its overly broad language, offends the controlling principles that: (i) a State may not, before fetal viability, constitutionally impose an undue burden on a woman's decision to have an abortion; and (ii) that "[a]n undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey*, 505 U.S. at 833, 112 S.Ct. 2791. In addition, Plaintiffs contend that the Act violates the rule in *Casey* by prohibiting postviability abortions even when necessary to

protect maternal health. Plaintiffs also argue that the Act is, for several reasons, void for vagueness. Finally, the Plaintiffs contend that the Act runs afoul of the Equal Protection Clause because it discriminates based on sex without being substantially related to the achievement of an important governmental objective. *See United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).

## B. THE CHALLENGED ACT

The Act, which went into effect on July 1, 1998, added certain provisions "relating to partial birth abortions" to Virginia's extant abortion regulatory statutes. *See* 1998 Va.Acts ch. 448 & 579.[5] Section 18.2–74.2(A), which is entitled "Partial birth abortion prohibited," provides that "[n]otwithstanding the provisions of §§ 18.2–72, 18.2–73 and 18.2–74, a physician shall not knowingly perform a partial birth abortion that is not necessary to save the life of a mother." Section 18.2–74.2(D) defines "partial birth abortion" to mean:

> an abortion in which the person performing the abortion deliberately and intentionally delivers a living fetus or a

---

**3.** Except where noted otherwise, the term "Plaintiffs" shall refer collectively to the individual and organizational plaintiffs.

**4.** Collectively, the defendants shall be referred to as "the Commonwealth" or "the Defendants."

**5.** That part of Virginia's criminal code which defines when, and under what circumstances, an abortion can be performed lawfully has been in effect since 1975 and is consistent with controlling Supreme Court authority respecting the regulation and proscription of abortion. The first provision in that statutory scheme is Va.Code Ann. § 18.2–71, which makes performance of an abortion a felony unless the abortion is otherwise permitted by ensuing code sections. Under Va.Code Ann. § 18.2–72, it is lawful to perform an abortion during the first trimester of pregnancy, the only limitation being that it must be performed by a licensed physician. Under Va. Code Ann. § 18.2–73, it is lawful to perform an abortion during the second trimester of

pregnancy, the only limitations being that the abortion be performed by a licensed physician in a hospital licensed by the State. Under Va.Code Ann. § 18.2–74, it is lawful to perform an abortion after the second trimester of pregnancy if: (i) the abortion is performed in a licensed hospital; (ii) the attending physician and two consulting physicians certify that the "continuation of the pregnancy is likely to result in the death of the woman or substantially and irremediably impair the mental or physical health of the woman"; and (iii) life support measures are available for the product of the abortion in the event of evidence of viability.

Under Va.Code Ann. § 18.2–74.1, if termination of a pregnancy by performing an abortion is necessary to save the life of the woman, none of the proscriptive terms of §§ 18.2–71, –73 or –74 shall apply. This section affords the physician the benefit of an affirmative defense. *See Simopoulos v. Virginia*, 221 Va. 1059, 277 S.E.2d 194 (1981), *aff'd*, 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983).

substantial portion thereof into the vagina for the purpose of performing a procedure the person knows will kill the fetus, performs the procedure, kills the fetus and completes the delivery.

A physician who violates Section 18.2–74.2(A) is guilty of a Class I misdemeanor, which is punishable by a maximum term of imprisonment of 1 year, a fine of not more than $2,500, or both. *See* Va.Code Ann. § 18.2–11 (Michie 1996).[6] A physician convicted of violating the Act also is at risk of forfeiting the privilege of practicing medicine. *See id.* §§ 54.1–2914 to –2915.

Several aspects of the Act are implicated in the Plaintiffs' challenge and thus must be kept in mind as the analysis of the claims proceeds. First, the Act criminalizes the providing of abortions by reference to whether the fetus is "living," not whether it is "viable." And, the Act defines only one circumstance exempt from its partial birth abortion ban: where the procedure is "necessary to save the life of a mother." *Id.* § 18.2–74.2(A). Furthermore, although the Act does require as a prerequisite to criminal liability that the physician at all times act "knowingly," and although it purports to criminalize only conduct that is, at least in part, "deliberate[ ] and intentional[ ]" (a mens rea previously unknown to the Virginia Code), the Act leaves undefined every constituent term in its definition of "partial birth abortion," such as the terms "delivers ... into the vagina," "living fetus," "substantial portion thereof," "procedure," "kills," and "completes the delivery." Many, if not all, of these terms have no generally accepted meaning in abortion practice.

Indeed, the term "partial birth abortion," itself has no accepted medical meaning. Rather, it is a term coined by legislators, anti-abortion activists, and the media.

The American College of Obstetricians and Gynecologists ("ACOG") has issued a statement of policy to put some medical form and content to this otherwise medically unrecognized term. To that end, ACOG has equated the term "partial birth abortion" with a medical procedure developed by an Ohio physician, Dr. Martin Haskell, known as "intact dilatation and extraction" and also referred to as "Intact D & X" or just "D & X." [7] According to the ACOG statement of policy, a D & X contains all four of the following elements performed in the following sequence:

1. Deliberate dilatation of the cervix, usually over a sequence of days;

2. Instrumental conversion of the fetus to a footling breech;

3. Breech extraction of the body excepting the head; and

4. Partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus.

(Pls.' Ex. 2.) According to ACOG, any procedure which does not contain all four of the above elements in sequence is not a D & X because these elements otherwise "are part of established obstetric techniques." (*Id.*)

Rather than drafting the Act with similar precision, the Virginia General Assembly chose language that, according to the Defendants, was intended to, and would, encompass not only the ACOG and Haskell descriptions, "but variations of the D & X procedure, including those that may be as-yet unidentified and/or uninvented." (Statement of the Commonwealth on the Construction of Virginia Code Section 18.2–74.2 at 4) (hereinafter "Stmnt.Comm."). In this endeavor, the Virginia legislature was not acting entirely

---

6. Under Section 18.2–74.2(B), a physician charged with an offense under subsection (A) is entitled to review by a medical board respecting his decision "whether the partial birth abortion was necessary to save the life of a mother."

7. Dr. Haskell described the procedure in a paper he presented in 1992. (Defs.' PI/TRO Ex. 23, Martin Haskell, M.D., *Dilation and Extraction for Late Second Trimester Abortion* (1992).)

without guidance because both HB1154 and SB552—identical bills the adoption of which resulted in the Act—were modeled after the federal Partial Birth Abortion Ban Act of 1997, H.R.1122, 105th Cong. (1997), which defined "partial birth abortion" as "an abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery." That proposed legislation, in turn, was viewed by its supporters in Congress as an improvement upon its predecessor, the Partial Birth Abortion Ban Act of 1995, H.R. 1833, 104th Cong. (1995), in large part because of a Senate amendment to the 1997 bill that further defined the phrase "vaginally delivers a living fetus before killing the fetus" as meaning "deliberately and intentionally delivers into the vagina a living fetus, or a substantial portion thereof, for the purpose of performing a procedure the physician knows will kill the fetus, and kills the fetus." *Id.* Senator Rick Santorum, the federal statute's principal sponsor in the Senate, explained that the purpose of the amendment was "to tighten up the language on what we mean by partial-birth abortion.... We have tightened up the language with mens rea, to use the legal term. That directs the mental state—as to what the doctor was doing when he was delivering the baby for the purpose of a live birth and is not doing an abortion." 143 Cong.Rec. S4671 (daily ed. May 19, 1997) (statement of Sen. Santorum).

With this change the federal statute received the endorsement of the American Medical Association (AMA), (Defs.' Ex. P, Attach. C, Letter from P. John Seward, M.D., Executive Vice President, AMA, to the Hon. Rick Santorum, United States Senate (May 19, 1997)), though in lending its support, the AMA's Board of Trustees did not supplant an earlier statement respecting partial birth abortion legislation: "The AMA recommends that the procedure not be used unless alternative procedures pose materially greater risk to the woman. The physician must, however, retain the discretion to make that judgment, acting within standards of good medical practice and in the best interest of the patient." (Defs.' Ex. P, Attach. A, Board of Trustees Report 26, at 15 (1997)) (hereinafter "AMA Report"). Nor did the final version of the 1997 federal legislation win the endorsement of ACOG—the organization representing physicians who would be impacted most directly—which maintained that:

> An intact D & X ... may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman, and only the doctor, in consultation with the patient, based upon the woman's particular circumstances can make this decision. The potential exists that legislation prohibiting specific medical practices, such as intact D & X, may outlaw techniques that are critical to the lives and health of American women. **The intervention of legislative bodies into medical decision making is inappropriate, ill advised, and dangerous.**

(Pls.' Ex. 2) (emphasis in original). The Partial Birth Abortion Ban Act of 1997 passed both houses of Congress but ultimately met with demise by way of presidential veto on October 9, 1997.

Virginia's General Assembly followed in the footsteps of Congress. The Act now under challenge, though slightly different in structure, is nearly identical in all relevant respects to the 1997 federal statute. In fact, the Governor and the sponsors of Virginia HB1154 and SB552 expressly linked Virginia's ban of "partial birth abortions" to the federal legislation. Accordingly, the Commonwealth now argues that the federal legislative history, which, on its face, purportedly demonstrates an intent to ban just the D & X procedure and nothing more, is a helpful resource in resolving any ambiguity in the Act.

The federal statute, however, was directed only at the D & X procedure. Its legislative history therefore is of marginal

utility in assessing the Act, which the Defendants say is considerably broader because it proscribes all present and future variants of the D & X. In any event, it is the record made in this action respecting the various methods of performing abortions (generally and by the Plaintiffs specifically) which controls the assessment of the Act. To that record, this analysis now turns.

## C. ABORTION METHODS

### 1. General Abortion Terminology and Practice

There are several undisputed facts which are of significance in understanding abortion methods and the issues presented by the Act. First, it is undisputed that the purpose of an abortion is to terminate a pregnancy and that all abortion procedures kill the fetus. Nor is it disputed that the plaintiff physicians and the employees of the institutional plaintiffs who perform abortions do so with the knowledge and intent that, in terminating the pregnancy, the fetus will be killed.

Also, it is undisputed that, in most medically acceptable methods of abortions, the fetus is removed from the uterus, through the cervical canal and cervical os, into and through the vagina, either intact or in parts.[8] In some methods of abortion performed during the first and second trimester, the fetus is brought from the uterus to the vagina in a syringe or through a cannula.

There is no dispute that the term "viability" means "the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb." *Casey*, 505 U.S. at 870, 112 S.Ct. 2791. And,

the parties are in agreement that, generally, viability occurs between 23 and 25 weeks lmp. Also, it is agreed that, in medical parlance, sustained cardiac activity over a period of time at a set rate evinces the existence of life in the fetus; that this event occurs usually at ten weeks lmp; and that fetal tissue may be alive in some sense of the word before ten weeks lmp. Thus, the undisputed record is that fetal "life" and fetal "viability" are entirely different states of fetal existence.

With these undisputed facts in mind, it is now appropriate to describe the basic methods of abortion. At the preliminary injunction hearing, the most reliable evidence about the methods of abortion came from Dr. Hausknecht, Dr. Jones, and Dr. Fitzhugh, each of whom is: (i) board-certified in obstetrics and gynecology; (ii) a member of ACOG; (iii) a teacher of medicine, including abortion, at respected medical facilities; and (iv) an expert in the area of abortions. Dr. Hausknecht has performed approximately 5,000 abortions and, as previously stated, Drs. Fitzhugh and Jones have performed many tens of thousands of abortions. These three witnesses have more, and more current, experience than the witnesses whose testimony the Defendants presented by affidavit at the preliminary injunction hearing. And, Dr. Kathi Aultman, who testified in person, was not current on the medical aspects of abortion; indeed, she last performed an abortion in 1982.

At the subsequent bench trial, the Plaintiffs presented considerably more detailed evidence about abortion practices and methods in testimony given by Dr. Fitzhugh and Dr. Charles A. deProsse and the

---

8. Dr. Hausknecht, who testified for the Plaintiffs at the preliminary injunction hearing, summarized the woman's anatomy as follows:

[T]he uterus is a muscular organ, about 80 percent of which lies within the abdominal cavity. The only portion outside of it, which is the cervix, is attached to the top of the vagina, the most distant part from the outside, and usually, in the nonpregnant state, it is about 2 inches in diameter and it

has a very tiny entrance called the cervical os, which, in a woman who has never been pregnant and never had a baby, might be 2 millimeters in diameter or maybe less.

The vagina is the muscular organ which is, now working your way from uterus to cervix down to the vagina, is the passage, if you will, that lies between the bladder and the rectum.

(P.I.Tr. at 52–53.)

videotaped deposition of Dr. Phillip G. Stubblefield. Dr. Fitzhugh testified in greater detail on abortion methods in general and on his practice in particular, and again the Court found his testimony to be fully credible and reliable. Dr. deProsse, a retired faculty member of the University of Iowa College of Medicine, also presented testimony about abortion methods and practices which was thoroughly credible and reliable. Dr. deProsse is a member of ACOG, he is board-certified in obstetrics and gynecology, he has published peer-reviewed articles relating to obstetrics and gynecology, and he estimates having performed more than 20,000 abortions. (Tr. at 112.) Dr. Stubblefield, who also is board-certified in obstetrics and gynecology, is a Professor and Chairman of the Department of Obstetrics and Gynecology at the Boston University School of Medicine, where he supervises and takes part in performing between 1,500 and 2,000 abortions per year. (Pls.' Ex. 4A at 10.) He is also presently the Chief of Obstetrics and Gynecology at the Boston Medical Center. Dr. Stubblefield's extensive experience with various abortion methods at gestational ages through twenty-three and one-half weeks lmp, as well as his publication of several articles in peer reviewed journals, many relating to abortion, renders his testimony a particularly helpful and reliable source of evidence.[9]

The evidence from the Defendants at the bench trial included the testimony of Dr. Harlan R. Giles, as well as the deposition testimony of Drs. Watson Bowes, Frank H. Boehm, and John Bruchalski. As a general proposition, the record at trial showed that the Defendants' witnesses were less current, and less experienced, on the topics of abortion and abortion procedures. For those and the following reasons, the Court finds their testimony to be materially less credible and reliable on the key issues of abortion methods, practice and medicine than the testimony offered by the Plaintiffs' witnesses.

Dr. Bruchalski, for example, did not consider himself an expert on abortion by virtue of the fact that he has not performed one since 1988 and, as he candidly admitted, an expert on abortion is "[s]omeone who performs many of them." (Defs.' Ex. L at 17.) And, Drs. Bowes and Boehm, though accomplished physicians and academics, exhibited similar deficiencies in experience, particularly when it came to the dilation and evacuation method of abortion, the mode of abortion directly implicated in assessing the Plaintiffs' overbreadth challenge to the Act. Only once has Dr. Bowes taken part in a D & E procedure on a living fetus, and that was over two years ago and in a supervisory capacity. (Defs.' Ex. J–2 at 12.) And, Dr. Boehm personally has performed only one D & E abortion in the past ten years, although that was in July 1998. (Defs.' Ex. K–2 at 18–20.)[10]

The other witness presented by the Defendants, Dr. Giles, has significantly more practical experience in abortion methods than do the Defendants' other witnesses. Dr. Giles also is a researcher and teacher. He estimates having performed several thousand abortions over a twenty-five year career. However, Dr. Giles performs considerably fewer abortions by the D & E method than other physicians with similar

---

9. Drs. Fitzhugh, deProsse, and Stubblefield all were accepted as experts in their fields. *See* Fed.R.Evid. 702; *Hope Clinic v. Ryan,* 995 F.Supp. 847, 851 (N.D.Ill.1998).

10. Dr. Boehm testified that he is current in his reading of the literature on the D & E procedure, but as he explained:

> When you don't perform a procedure, you lose touch. I read the literature but I think it's safe to say if you don't do a procedure, for whatever reason, *you can't consider yourself as much of an expert as someone who does them on a routine basis.*
> ***
> I am aware of the advances [in D & E technique] by my reading but not performing them makes me *less of an expert,* let's say, in the actual performance than someone who does them every day.

(*Id.* at 20–21) (emphasis added).

practices because he prefers the induction technique. (Tr. at 324–25, 332, 372, 379). Furthermore, the Court found Dr. Giles to be more focused on the political aspects of the abortion debate than on the medical questions essential to resolution of the issues presented in this action. And, Dr. Giles was evasive when responding to questions directed at crucial issues in the case.[11] Hence, the testimony of Dr. Giles was neither credible, reliable nor helpful.

Consequently, the following explanation of abortion methods and practices generally, and as practiced by the Plaintiffs, is drawn primarily from the testimony of Dr. Fitzhugh, Dr. Jones, Dr. deProsse, Dr. Hausknecht and Dr. Stubblefield whom the Court, as finder of fact, has determined to have offered the most current, credible and reliable evidence on the topic of abortion methods and practices. And, as to the practices of Dr. Fitzhugh and Dr. Jones, there is no evidence which impeaches, in the slightest, their version of their practice of abortion medicine.

### 2. Specific Abortion Techniques

Resolution of the legal issues presented here requires an understanding of the several abortion methods and the relative safety of each. As presented by the record, the methods are: (1) medical abortion; (2) suction curettage; (3) dilation and evacuation, or D & E; (4) intact dilation and extraction, or D & X; (5) induction, including instillation; and (6) surgical alternatives of hysterectomy or hysterotomy.

### a. Medical Abortions

At the very earliest stage of pregnancy, e.g., 49 to 53 days lmp, Drs. Fitzhugh and Jones use medications to induce abortions in a small percentage of their patients, estimated to be at approximately one percent. The Plaintiffs do not contend that the Act interferes with their ability to provide, or their patients to receive, these types of abortion procedures.

### b. Suction Curettage

The most common method of abortion used through the first trimester (approximately thirteen weeks lmp) is known as suction curettage or vacuum aspiration. In this procedure, the doctor mechanically dilates the cervix with metal rods until there is enough dilation to insert a plastic tube or cannula. (Pls.' Ex. 4A at 30–31.)[12] The appropriate degree of dilation depends on how far along the pregnancy is. (Id. at 31) Once the dilation is complete, the physician inserts the cannula through the vagina, through the cervix, and into the uterus. (Id.) The end of the cannula is connected by tubing to an electric vacuum pump that creates negative suction. (Id.) The physician rotates the cannula around the uterus, pulling it slightly in and out, so to evacuate the uterine content and remove the embryo or fetus by means of negative suction. (Id.) Upon complete removal of all of the products of conception with the cannula, the physician explores the uterine cavity either with the cannula or a dull curette to check for remaining pregnancy-related tissue. (Tr. at 133.) This final step is performed to prevent infection. (P.I.Tr. at 27.) Generally, the entire procedure is only three to five minutes in duration. (Pls.' Ex. 4A at 34.) Suction curettage can be used on occasion as late as fifteen weeks lmp.

---

11. For example, Dr. Giles was shown to have given inconsistent statements, under oath, as to the meaning of " 'substantial portion' of a living fetus," a crucial issue in this case. (Tr. at 428–29; Pls.' Ex. 5 ¶ 12.) Dr. Giles also acted evasively when asked whether the purpose of a D & E abortion, like that of a D & X abortion, is to kill the fetus. (Tr. at 383–84.) Dr. Giles' position—that the purpose of the former is to evacuate the uterus, whereas only the latter is done with the purpose of killing the fetus, even when the two are performed at like gestational ages—is contrary to the overwhelming record before the Court and amounts to an untenable distinction.

12. The medical term is "dilatation." The vernacular, particularly in judicial opinions, is "dilation." The terms seem to be used interchangeably and they will be so used here.

The physician knows at the outset of a suction curettage abortion that the procedure will kill the fetus. (Tr. at 132; P.I.Tr. at 22.) [13] And, the fetus unquestionably is killed during the suction curettage procedure. Application of the vacuum quickly disrupts the fetus and placenta into small pieces *in utero,* resulting in the products of conception moving piecemeal in a stream through the cannula and plastic tubing. (Pls.' Ex. 4A at 33.) The removed parts pass into, and through, the vagina by way of the cannula.

It is quite likely that, after fetal parts start to become disarticulated and begin to be suctioned out of the uterus and into the vagina during the suction curettage, the portion of the fetus remaining in the uterus is still living (in the sense that it has a heartbeat). (P.I.Tr. at 35–37.) That is because fetal death does not usually follow immediately from disarticulation but, instead, may take a matter of minutes. (Tr. at 131; Pls.' Ex. 4A at 35.) [14] And, on occasion, the fetus comes out of the uterus entirely intact during a suction curettage procedure. This generally is the product of happenstance, occurring when the physician has misjudged the duration of the pregnancy and used a cannula large in diameter relative to the unexpectedly small fetal size. (Pls.' Ex. 4A at 34.)

Although suction curettage is used through the first trimester, as the pregnancy progresses, the physician must increase the diameter of the cannula to achieve the intended result and this, in turn, requires greater dilation of the cervix. (*Id.* at 34, 36.) Also, by approximately thirteen weeks lmp, the fetal tissue is stronger and, consequently, suction curettage tends to become less efficacious because it is a slower procedure resulting in greater maternal blood loss and because the fetus is too large to remove by suction alone. For those reasons, starting around twelve weeks lmp, the primary utility of the suction curettage—its speed—generally is considered to be outweighed by the risks of tearing the cervix during dilation and of increased maternal blood loss. (*Id.* at 36–37.) [15] Therefore, at this stage of gestation, physicians generally combine traditional suction curettage with the use of forceps to remove the products of conception. (*Id.*) The use of forceps is a defining characteristic of the D & E procedure. (Tr. at 50; Pls.' Ex. 4A at 36.) [16]

### c. Dilation & Evacuation (D & E)

The second trimester begins at approximately the thirteenth week lmp. Currently, most abortions in the second trimester are accomplished by using the D & E method. D & E is an accepted and widely used method of abortion from about 13 to 20 or 21 weeks lmp. D & E abortions account for approximately ninety-five percent of post-first trimester abortions nationally.

13. At the beginning of the suction curettage procedure, the physician assumes that the fetus shows cardiac activity; however, as a general proposition, no effort is made to determine whether it is or is not living. (Tr. at 131; Pls.' Ex. 4A at 31–34; P.I.Tr. at 24–25.)

14. In the context of a suction curettage, however, the physician generally does not use continuous ultrasound and hence has no way of knowing precisely whether there is continued cardiac activity. (P.I.Tr. at 36.)

15. It is generally accepted, as a medical proposition, that the safety of an abortion is a function of the speed at which the procedure can be performed because the risk of complication and death during any abortion procedure increases with the amount of time consumed by the procedure.

16. For abortions performed as early as 8 to 10 weeks lmp, Dr. Fitzhugh often finds it necessary to use forceps to grasp part of the fetus and remove it from the uterus. (Tr. at 50.) Dr. Fitzhugh testified that he avoids labeling his procedures as "suction curettage" or "dilation and evacuation" because he views the two techniques as variations of one procedure. Rather than choosing one label or another, Dr. Fitzhugh merely sets out to terminate the pregnancy, and he employs forceps if the gestational age or other conditions so require. (*Id.*)

Because the pregnancy is further along, a physician performing a D & E must dilate the cervix more widely than is done for suction curettage. This is accomplished by inserting osmotic dilators such as laminaria through the vagina and into the cervical canal. (Tr. at 137–38; Pls.' Ex. 4A at 39–40.)[17] The dilation process typically lasts several hours, and may go on overnight. (Pls.' Ex. 4A at 40.) When the cervix is sufficiently dilated and the dilators have been removed, the physician uses suction to rupture the amniotic sac and then uses a combination of forceps and suction to remove the fetus and other products of conception. (Tr. at 138–44; Pls.' Ex. 4A at 40–41.) Usually, the physician removes the fetus in parts, but sometimes the fetus is removed largely intact. (Tr. at 151–53.) The dismemberment may occur *in utero*, or it may occur in the vagina. (P.I.Tr. at 51.) When the physician assesses that the uterus is empty, he reinserts the vacuum and checks to be sure no tissue remains in the cavity. (Pls.' Ex. 4A at 41.)

At the start of the D & E procedure, the physician is reasonably certain that the fetus is alive, and he sets out to perform a procedure that he knows will bring about fetal demise. (Tr. at 148, 150.) In fact, during the D & E abortion, the physician knowingly performs a number of distinct acts that the physician knows will cause fetal demise. (Tr. at 152.)

These distinguishing features are most pronounced during the later stages of gestation, *e.g.*, 18 to 20 weeks, when the pre-viability D & E procedure no longer is a close variant of the suction curettage method. At that stage of gestation, the initial application of suction removes only amniotic fluid and membranes, perhaps part of the placenta, and, in one-third to about one-half of the cases, the umbilical cord. (Tr. at 51–53, 140–45; Pls.' Ex. 4A at 44; P.I.Tr. at 160–69.) This alone does not kill the fetus; but, in the 30% to 50% of the cases when the suction brings the cord into the vagina, the physician, acting deliberately and intentionally, will detach the cord, an act that inevitably causes fetal death, albeit not always at the moment of detachment. (Tr. at 52, 140–41, 145.) In any event, at the later stages of gestation, the initial suction is unable to complete the abortion without further instrumentation. The physician, therefore, must then reach into the uterus with forceps and avulse into the vagina, and then out of the body, pieces of the still-living fetus, such as the extremities, parts of the trunk, and the head. (Pls.' Ex. 4A at 44.) The order in which the physician removes these parts depends on whether the fetus is presenting head first or feet first. (*Id.* at 45.)

More commonly, at 18–20 weeks lmp, the fetus presents feet first. (Pls.' Ex. 4A at 45, 47.)[18] Thus, in the usual case, the physician reaches into the uterus with the forceps, grasps either or both extremities, and pulls downwardly. (Pls.' Ex. 4A at 47.) The overarching goal of that deliberately and intentionally performed act is to bring as much of the fetus as possible into the vagina with one grasp because physicians generally recognize that the risks attendant to D & E, which include, *inter alia*, the possibility of inserting an instrument in a way that perforates the uterus and the risks of infection, are vastly reduced by avoiding unnecessary passes into the uterus with the forceps and by completing the procedure as expeditiously as possible. (Tr. at 145, 153–55; Pls.' Ex. 4A

---

**17.** The laminaria pull water out of the cervix and swell, which has the dual effect of softening the cervical tissue and exerting a gentle, steady pressure so that eventual removal of the laminaria results in a dilated cervix. (Tr. at 137; Pls.' Ex. 4A at 40.)

**18.** Most elective abortions, by D & E or otherwise, are performed before 18–20 weeks lmp. The most reliable sources of national data indicate that only 4% of abortion procedures, or 60,040 abortions, were performed between 16 and 20 weeks lmp in 1992. (AMA Report at 5 .) Of these procedures, approximately 86% were by the D & E method. (*Id.* at 7.)

at 40, 55, 57; P.I.Tr. at 51.) [19] At times during this process, the physician may remove an intact fetus, and this can require compressing the cranium so that it passes through the dilated cervix. (Tr. at 152; Pls.' Ex. 4A at 45, 53.) Intact removal of a previable fetus, by definition, kills the fetus. (Pls.' Ex. 4A at 48.) The act of compressing or crushing the skull to achieve intact delivery also has the effect of causing fetal death, but not immediately. (Tr. at 147.) Physicians know that these circumstances can and do occur not infrequently, and, in the case of an intact fetus, the physician deliberately and intentionally performs these procedures knowing and intending that fetal demise inevitably will ensue.

More often it is the case that intact delivery does not occur because of insufficient dilation and/or because part of the fetal body or head becomes lodged against the uterine wall, as a result of which the head or an extremity detaches. (P.I.Tr. at 56.) [20] At the time the part detaches, it is not unusual that the fetal extremities or body may already be outside of the uterus and in the vagina. (Pls.' Ex. 4A at 48.) And, of course, the physician knows that disarticulation of the fetal leg (or other body part), standing alone, will kill the fetus, although it may take several minutes because (in the case of a disarticulated extremity) the mechanism for causing death is excessive blood loss. (Tr. at 55–

56, 58–59, 141, 145, 147; Pls.' Ex. 4A at 48.) Thus, in this technique, the physician deliberately and intentionally delivers the fetus or a fetal part into the vagina for the purpose of performing one of these acts with the intent to abort the pregnancy, *i.e.,* to kill the fetus. And, death then ensues.

At later gestational periods, the D & Es performed by Drs. Jones and Fitzhugh comport with these general descriptions, though as is the case with any abortion procedure, every physician uses personal variations in performing the abortion. For example, Dr. Jones starts with suction, and, although he has an express preference for suction procedures, he resorts to forceps early on in a procedure at 18–20 weeks. (P.I.Tr. at 162.) Dr. Fitzhugh also starts with suction, and in approximately one-third of the procedures, he is able to remove the umbilical cord with suction before resorting to forceps. After he brings the umbilical cord into the vagina Dr. Fitzhugh severs it, an act that he knows will inevitably, although not always immediately, result in fetal death. (Tr. at 52–54.) Other times, Dr. Fitzhugh is unable to bring down even the umbilical cord with suction. Then he inserts the forceps and grasps: "[Y]ou pull on whatever part you have, and you'll either have a part or, in a rare instance, you will have the whole thing." (Tr. at 54.) Dr. Fitzhugh has removed an intact fetus during a D & E,

---

**19.** Dr. deProsse cogently explained this rationale:

> It is possible that the procedure done to dismember the fetus, where repeated forays are made into the uterine cavity with grasping forceps, more likely would cause perforation of the uterus and damage that way than the procedure where a single pass was made to bring down a fetal limb and the remainder of the fetus was delivered.
>
> So the procedure where the entire fetus is delivered probably is less risky from the standpoint of what damage might be done to the uterus than the procedure where the fetus is dismembered and brought down. (Tr. at 153–54.)

**20.** It is for this reason, and not because it happens by mere fortuity, that Dr. Hausk-

necht testified that physicians consider themselves "lucky" when the fetus is removed intact in a D & E procedure. (P.I.Tr. at 58–59.) As Dr. Hausknecht explained, the physician performing a D & E at 18–20 weeks lmp knows that, in all likelihood, the procedure will involve avulsing fetal parts—often after they have been brought through the cervix and into the vagina—from the body of the fetus which has become lodged in the uterus or is too large to pass through the cervical os intact. (*Id.*) However, the physician's overarching goal is to keep intrusion into the uterus at an absolute minimum and, to that end, he is pleased when able achieve intact removal without concomitantly excessive dilation. *Compare Gilmore,* 144 F.3d at 330.

but most often he grasps a fetal part, such as the umbilical cord or an extremity, pulls it into the vagina, and then avulses it, which he knows will cause fetal demise. (Tr. at 55–57, 59, 64, 89, 107.) Once Dr. Fitzhugh has finished extracting the fetal parts he uses suction to remove whatever tissue or fluid remains in the uterus. (Tr. at 55, 61.)

### d. Intact Dilation and Extraction ("D & X")

Much of the evidence in this record relates to a method of abortion described earlier as the D & X, a procedure that assumed great prominence in this country by virtue of a presentation made by Dr. Martin Haskell, an Ohio obstetrician, in September 1992. Dr. Haskell was a plaintiff in *Women's Medical Professional Corp. v. Voinovich*, 911 F.Supp. 1051 (S.D.Ohio 1995), *aff'd*, 130 F.3d 187 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998), where the district court described the D & X procedure as follows:

On the first and second days of the procedure, Dr. Haskell inserts dilators into the patient's cervix. On the third day, the dilators are removed and the patient's membranes are ruptured. Then, with the guidance of ultrasound, Haskell inserts forceps into the uterus, grasps a lower extremity, and pulls it into the vagina. With his fingers, Haskell then delivers the other lower extremity, the torso, shoulders, and the upper extremities. The skull, which is too big to be delivered, lodges in the internal cervical os. Haskell uses his fingers to push the anterior cervical lip out of the way, then presses a pair of scissors against the base of the fetal skull. He then forces the scissors into the base of the skull, spreads them to enlarge the opening, removes the scissors, inserts a suction catheter, and evacuates the skull contents. With the head decompressed, he then removes the fetus completely from the patient.

*Id.* at 1066 (footnotes omitted). As mentioned earlier, ACOG described the procedure slightly differently, but generally in the same fashion. (Pls.' Ex. 2.) The AMA describes essentially the same procedure as an Intact D & X. The Defendants argue that the Act targets "the D & X procedure, including potential variations thereof." (Defs.' Post–Tr.Br. at 10.)

As a general proposition, the D & X is a variation of the common D & E procedure. (AMA Report at 8; P.I.Tr. at 94.) Any or all of the steps that occur during the D & X procedure can occur during a D & E procedure. (Pls.' Ex. 2; P.I.Tr. at 94.)[21] The D & X has not been the subject of clinical trials or peer-reviewed studies, and it is not taught in medical schools. Consequently, not a great deal is known about its relative safety. There is evidence that the length of dilation required to complete a D & X abortion is dangerous and can result in an "incompetent cervix," i.e., a cervix that is weakened as a result of excessive dilation with the effect being that future pregnancies may miscarry in the second trimester or deliver prematurely. (Tr. at 358.) There is also evidence, how-

**21.** The Defendants maintain that the D & X is a completely distinct procedure, perhaps in recognition that terming the D & X a variant of the D & E tends to render their justification for the Act's broad language—that it is intended to proscribe the D & X and "potential variations"—even more constitutionally suspect. This question must be resolved against the Defendants because the characterization of the D & X as a variant of the D & E follows from the defining features of the D & E procedure: the use of osmotic dilators and forceps in addition to suction to evacuate the uterus. Other courts likewise have recognized that the phrase "D & X" describes a kind of D & E procedure. *See, e.g., Planned Parenthood of Greater Iowa, Inc. v. Miller*, 30 F.Supp.2d 1157, 1161 (S.D.Iowa 1998); *Planned Parenthood of Central New Jersey v. Verniero*, 41 F.Supp.2d 478, 484 (D.N.J.1998); *A Choice for Women v. Butterworth*, 54 F.Supp.2d 1148, ——, No. 98–0774, slip op. at 9 (S.D.Fla. Dec.2, 1998); *Hope Clinic v. Ryan*, 995 F.Supp. 847, 852 (N.D.Ill.1998); *Evans v. Kelley*, 977 F.Supp. 1283, 1293 (E.D.Mich.1997).

ever, that some physicians use the D & X procedure to minimize uterine perforation caused by fetal parts or medical instruments, that the procedure may be helpful to women who for mental health reasons desire an intact fetus, and that the procedure may be particularly helpful where an intact fetus is desirable for diagnostic purposes. (Tr. at 62–63; Pls.' Ex. 4A at 55, 57, 62, 65; P.I.Tr. at 80.) [22]

### e. Induction

The only routinely performed alternative to D & E after approximately fifteen weeks lmp is the induction abortion which accounts for approximately four percent of post-first trimester abortions nationwide. In this form of abortion, the physician induces labor by using one or a combination of several chemicals. The chemicals are most often introduced by vaginal suppositories or amniocentesis, which involves injecting a variety of substances into the amniotic sack. (Tr. at 331.) [23] Labor lasts anywhere from ten to thirty hours, generally resulting in the delivery of an intact fetus. (Pls'. Ex. 4A at 61.)

Dr. Giles testified that, at least in the case of induction achieved by injecting hypertonic saline, the injection of the solution itself causes fetal death before delivery. (Tr. at 332.) Other testimony showed, however, that some physicians perform pre-viability inductions in which they know, or have reason to believe, that the fetus is living when it is delivered into the vagina. (Tr. at 134; Pls.' Ex. 4A at 60.) In those instances, the physicians also know that the fetus will not survive outside the womb because it is too immature. (Tr. at 134; Pls.' Ex. 4A at 60.) Of course, the induction abortion in fact does kill the fetus; and, the physician knows that fact and intends that result.

It is undisputed that, during an induction abortion, complications may arise that necessitate resorting to the D & E method to empty the uterine cavity. In any of these situations, fetal death may occur while the fetus is partially or entirely in the vagina. For example, as Dr. Stubblefield explained:

> [Y]ou may have hemorrhage, active bleeding, and the solution is to evacuate the uterus, basically do a D & E, not wait for further bleeding. Or sometimes with labor induction abortion infection can develop and get to be quite severe, and again the best treatment is to terminate the pregnancy with the D & E rather than waiting further for the pregnancy to come out on its own.

(Pls.' Ex. 4A at 67.) In other instances, it is necessary to convert an induction abortion to a D & E procedure because the fetal head has become trapped in the cervix after the extremities and torso have passed through the cervix into the vagina. (Tr. at 135, 333.) Upon that infrequent, but not rare, occurrence, one common technique used to complete the abortion entails the use of crushing forceps to decrease the diameter of the fetal skull and facilitate delivery. (Tr. at 136, 334.) Crushing the skull, of course, is an act that the physician knows will kill the fetus, just as it does when performed in the context of a D & E or a D & X. (Tr. at 136.)

Although induction generally is considered a safe alternative to the D & E, an induction abortion involves different maternal consequences, such as physiological stress, emotional stress, medical complications, and risks similar to labor and delivery at term. (Pls.' Ex. 4A at 61, 66–67; P.I.Tr. at 130.) The statistical evidence available from the Center for Disease Control (CDC) shows that the D & E method

---

**22.** Dr. Giles disputed this last point, opining that the suctioning of skull contents in a D & X frustrates any meaningful genetic testing. (Tr. at 363.) Dr. Giles' observations were limited, however, to testing for birth defects involving the central nervous system. (*Id.*)

**23.** The subset of induction abortions whereby a substance is injected into the uterus through the abdomen using a needle or into the cervix using a needle is termed "instillation" abortion.

has a lower complication rate than induction and, when measured up to twenty weeks lmp, a lower maternal mortality rate. (Tr. at 336; Defs.' Ex. K–2 at 95; AMA Report at 10; P.I.Tr. at 100.)[24] For these reasons, the induction method is not considered appropriate for all women. Cardiovascular disease, for example, is a contraindication for induction. (Pls.' Ex. 4A at 67.) Conditions like a hysterotomy scar or marked obesity also counsel against the induction method. (Tr. at 155.) And, some physicians elect the D & E method rather than labor induction methods for second-trimester abortions because D & E has a lower mortality rate, it takes less time, it is less expensive, it can be done on an outpatient basis, and it takes less of a psychological toll on women because it does not imitate labor. (AMA Report at 11.)

### f. Surgical Alternatives: Hysterotomy and Hysterectomy

It is also possible to terminate pregnancy by using a hysterotomy or a hysterectomy, both of which are surgical procedures and entail the risks of major surgery. A hysterotomy is a cesarean section accomplished before term; however, it involves even more blood loss and other damage than does a cesarean section because the uterus is thicker than at term. A hysterectomy is the removal of a uterus and, of course, the procedure leaves a woman permanently sterile. Unsurprisingly, these procedures are rarely used as abortion methods largely because of the associated rates of maternal mortality and morbidity which are many times greater than either D & E or induction.

The foregoing facts respecting the methods of abortion and their relative safety have been proved by the record evidence. Much of that record is not even in dispute and, on that which is disputed, the Plaintiffs have met their burden. Against these findings, the legal issues will be addressed.

## II. STANDING

### A. BASIC PRINCIPLES

■ Article III of the Constitution defines federal judicial power in terms of "[c]ases" and "[c]ontroversies." U.S. Const. Art. III, § 2. By virtue of that requirement, plaintiffs who invoke federal jurisdiction first must demonstrate their standing—that is, plaintiffs must demonstrate that they are the proper parties to bring a particular matter to a federal court for adjudication. To that end, the Plaintiffs here must establish that: (1) they personally have suffered some actual or threatened injury as a result of the allegedly unconstitutional statute; (2) the actual or threatened injury fairly can be traced to the challenged statute; and (3) the actual or threatened injury is likely to be redressed by a favorable decision by the federal court. See *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). In the context of a pre-enforcement review of newly-enacted and potentially unconstitutional criminal legislation, the focal point of the standing inquiry is the first element; and, in that respect, "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); see also *Doe v. Duling,* 782 F.2d 1202, 1205 (4th Cir.1986).

---

**24.** Dr. Giles opined that these statistics were not reliable. According to Dr. Giles, the complication reporting rate for D & Es is underestimated because most D & Es are performed on an outpatient basis whereas induction methods are performed in hospitals. (Tr. at 355.) This view of the CDC statistics is based on Dr. Giles' subjective opinion respecting the places at which D & E abortions are performed. Considering that the CDC has not issued any such caveat respecting its statistics, considering that no other expert impeached the CDC statistics and taking Dr. Giles' demonstrated bias into account, his view of the CDC statistics cannot be credited as valid.

### 1. Law of the Case

As a threshold matter, the Commonwealth argues that the opinion of Judge Luttig staying this Court's order of preliminary injunction, *see Richmond Medical Center for Women v. Gilmore*, 144 F.3d 326 (4th Cir.1998) (the "Stay Opinion"), is the law of the case which bars consideration of the Plaintiffs' standing.

On the basis of a limited record, the Stay Opinion initially observed that the Act cannot reasonably be interpreted to reach either the suction curettage or "conventional" D & E methods of abortion, and, then later held that the Plaintiffs had not established "the likelihood that they will ultimately be held to have standing to pursue their action." *Id.* at 332. Apparently applying a truncated version of the Fourth Circuit's test for the issuance of a stay, *see Long v. Robinson*, 432 F.2d 977 (4th Cir.1970), the Stay Opinion therefore stayed enforcement of this Court's preliminary injunction. One month later, a panel, comprised of Judge Luttig, Judge Widener and Judge Murnaghan, voted, over the dissent of Judge Murnaghan, to deny, without opinion, the Plaintiffs' motion to vacate the stay.

▇▇▇ The Stay Opinion, issued in that procedural posture and under those circumstances, is not law of the case. That doctrine is "an essentially equitable doctrine of judicial procedure" that applies to legal questions actually or implicitly decided. *Sejman v. Warner–Lambert Co.*, 845 F.2d 66, 68–69 (4th Cir.1988). When a decision of an appellate court establishes "the law of the case," it "must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal" unless some exception applies. *Id.* at 69 (quoting *EEOC v. International Longshoremen's Assoc.*, 623 F.2d 1054 (5th Cir. 1980)); *see also Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) ("[L]aw of the case is an amorphous concept ... [that] directs a court's discretion, ... [but] does not limit the tribunal's power."). That the law of the

case doctrine is ill-suited for application to a stay order issued pursuant to Fed. R.App.P. 8—even one left in place by a panel on a motion to vacate—is clear. Most circuits to have considered the issue, including the Fourth Circuit, have concluded that decisions rendered by panels on motions, especially on jurisdictional issues, are tentative rulings only and are not the law of the case. *See, e.g., Law v. National Collegiate Athletic Ass'n*, 134 F.3d 1025, 1028 n. 3 (10th Cir.1998); *CNF Constructors, Inc. v. Donohoe Construction Co.*, 57 F.3d 395, 398 n. 1 (4th Cir.1995); *American Federation of Grain Millers, Local 24 v. Cargill Inc.*, 15 F.3d 726, 727 (7th Cir. 1994). Where, as here, it is an inferior court that faces a prior panel ruling on a motion, there may indeed be situations in which that principle is not fully applicable. But, that is not so where the prior determination that is argued to be the "law of the case" involved not a decision on the merits, but rather the more narrow issue of reasonable likelihood of success at one point early in the litigation. *See Gilmore*, 144 F.3d at 332; *cf. United Elec. Radio & Machine Workers v. 163 Pleasant St. Corp.*, 987 F.2d 39, 47–48 (1st Cir.1993) (district court erred in dismissing case on jurisdictional grounds after previous appellate panel had held that plaintiffs' initial jurisdictional showing was insufficient to support district court's preliminary injunction); *Daniel v. Underwood*, No. 2:98–0495, slip. op. at 8 (S.D.W.Va. Nov. 5, 1998) (noting that the Stay Opinion "was not a decision on the merits of that case; and therefore, the decision is not binding on this Court").

▇▇▇ Even if the Stay Opinion qualified as the law of the case, subsequent consideration of the Plaintiffs' standing in this action is not foreclosed. One exception to that doctrine is when "a subsequent trial produces substantially different evidence"; another is when "the prior decision was clearly erroneous and would work manifest injustice." *Sejman*, 845 F.2d at 69 (quoting *International Longshoremen's Assoc.*,

623 F.2d at 1054). In this case, the Stay Opinion was confined to the record as it existed on June 30, 1998. Citing extensively the decision in *Planned Parenthood v. Doyle,* 9 F.Supp.2d 1033 (W.D.Wis. 1998), a case in which the district court refused to preliminarily enjoin Wisconsin's "partial birth abortion" statute, and which the Seventh Circuit already had stayed and which it subsequently reversed, *see Planned Parenthood v. Doyle,* 162 F.3d 463 (7th Cir.1998), the Stay Opinion determined that, on the limited record then available, the Plaintiffs had not established a reasonable likelihood of prevailing on the issue of their standing. *See Gilmore,* 144 F.3d at 328, 329, 330. It cannot be seriously disputed that the ensuing bench trial presented additional evidence concerning abortion practice both in general and as performed by these Plaintiffs. In particular, the evidence at trial supplemented substantially the preliminary injunction record in showing that some commonly performed D & E abortions are not "conventional D & Es" at all, as that term is used by the Defendants and apparently as it was used in the Stay Opinion. As will be seen, the complete record establishes that the Act applies to D & E procedures. Without doubt, then, the "law of the case" doctrine cannot be said to preclude consideration of the Plaintiffs' standing. *See Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912) (Holmes, J.) (law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power").

### 2. The Established Law of Standing: Actual and Threatened Injury

The Defendants next argue that the Plaintiffs cannot establish an actual or threatened injury because none of the physicians or clinics perform the D & X procedure. And, it is undisputed that none of the Plaintiffs currently perform the D & X procedure. The Defendants then supplement this standing argument with affidavits from the Commonwealth's Attorney Defendants, and with the opinions of the Attorney General and the Governor, which are said to prove that the only prosecutions under the Act will be against physicians and hospitals performing the D & X procedure. Of course, at the same time, the Defendants argue that the Act applies to more than the D & X because it covers all variants, present and future, of that procedure. Nonetheless, from these two points of departure, the Defendants assert that there is no actual or threatened injury because there is no "real and immediate" threat of prosecution, but only a conjectural and speculative fear of prosecution that is insufficient to provide standing in this action.

The Defendants' standing argument fundamentally misapprehends the applicable inquiry and the rather settled precedent on this topic in the Supreme Court's jurisprudence on standing, particularly in abortion cases. Where, as here, there is a pre-enforcement challenge to a criminal statute on constitutional grounds, two related injuries must be considered. First, there is the injury inherent in the threat of arrest and prosecution. On that point, the Supreme Court has explained repeatedly that "it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *see Babbitt,* 442 U.S. at 297, 99 S.Ct. 2301; *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Second, in limited circumstances, litigants are entitled to predicate injury on the existence of a statute which results in more than a "subjective" chill on the exercise of constitutionally-protected rights, even though not blossoming into an arrest and prosecution. *See Meese v. Keene,* 481 U.S. 465, 472–73, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987); *New Hampshire Right to Life Political Action Committee v. Gardner,* 99 F.3d 8, 13 (1st Cir.1996).

To be sure, the second type of injury generally has its genesis, and thus is most often considered cognizable, in the First Amendment context, where the "over-breadth" vehicle of constitutional attack is available to a litigant that has demonstrated some first-party "injury." *See, e.g., Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 508, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (White, J., concurring); *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). However, overbreadth analysis also pervades fundamental rights cases involving abortion. Indeed, the decision in *Roe v. Wade* employed an overbreadth approach. *See Ada v. Guam Society of Obstetricians and Gynecologists*, 506 U.S. 1011, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting from denial of petition for writ of certiorari) (citing *Roe*, 410 U.S. at 164, 93 S.Ct. 705). And, in *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), *overruled in part on other grounds, Casey*, 505 U.S. at 833, 112 S.Ct. 2791, the Supreme Court, in describing the constitutional shortcomings in the Pennsylvania statute that imposed various procedural hurdles before women seeking abortions, seemingly applied an overbreadth approach. *See id.* at 768–69, 106 S.Ct. 2169 (explaining that the Court "consistently has refused to allow government to chill the exercise of constitutional rights by requiring disclosure of protected, but sometimes unpopular, activities. Pennsylvania's reporting requirements ... pose an unacceptable danger of deterring the exercise of [abortion] right[s], and must be invalidated") (citations omitted).

■ Most recently, the Supreme Court in *Casey* enunciated the "undue burden" test for assessing the constitutionality of an abortion regulation, which asks whether "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." 505 U.S. at 895, 112 S.Ct. 2791. In concluding that some potentially valid applications of an abortion regulation would not save a statute with a significant number of invalid applications, the *Casey* approach is virtually indistinguishable from the traditional overbreadth inquiry. *See Eubanks v. Stengel*, 28 F.Supp.2d 1024, 1030 (W.D.Ky. 1998); *Evans v. Kelley*, 977 F.Supp. 1283, 1311–314 (E.D.Mich.1997); Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan.L.Rev. 235, 2771–77 (1994).[25] Accordingly, just as standing may be predicated on the tendency that a criminal statute may have to chill constitutionally protected speech, so too does an "actual injury" exist when a plaintiff challenging an abortion regulation demonstrates a chilling effect on his practice, which in turn impacts the fundamental right to choose an abortion before viability

**25.** The *Casey* standard is inconsistent with the standard for facial challenges set forth in *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Under *Salerno*, a facial challenge to a statute is successful only if the challenger demonstrates that "no set of circumstances exist under which the Act would be valid." *Id.* at 745, 107 S.Ct. 2095. Although the Fourth Circuit has refrained from deciding whether *Casey* supplanted the *Salerno* standard for facial challenges in the abortion context, *see Planned Parenthood of the Blue Ridge v. Camblos*, 155 F.3d 352, 359 & n. 1 (4th Cir.1998) (en banc), *cert. denied,* —— U.S. ——, 119 S.Ct. 1031, 143 L.Ed.2d 40 (1999), almost every other court to have visited the issue has followed "what the Supreme Court actually did—rather than what it failed to say—and appl[ied] the undue-burden test" without regard to *Salerno. Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 195–96 (6th Cir.1997) (quoting *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1458 (8th Cir.1995)), *cert. denied,* —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998); *see Gilmore*, 11 F.Supp.2d at 820 n. 28 (collecting cases). Having embraced that conclusion at the preliminary injunction stage, the Court adheres to it here. *See infra* Part III.A.

without undue interference from the state. *Cf. City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 427, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (explaining that the abortion right requires that the physician be given room to exercise judgment, "both assisting the woman in the decisionmaking process and implementing her decision should she choose abortion"), *overruled in part on other grounds, Casey*, 505 U.S. at 882, 112 S.Ct. 2791.

█ Both sorts of injury are, of course, related because both hinge on the existence of a credible threat that the challenged law will be enforced against the plaintiffs. In the context of a pre-enforcement challenge to a criminal statute, the standard set forth in the Supreme Court's decision in *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), incorporates and recognizes both types of injury. *Babbitt* held that, to satisfy Article III's requirement of "injury," the plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that "there exists a credible threat of prosecution thereunder." *Id.* at 298, 99 S.Ct. 2301. A credible threat must be both real and immediate, not merely conjectural or hypothetical. *See id.* at 298, 99 S.Ct. 2301; *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

The Supreme Court has emphasized, however, that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301 (quoting *Pennsylvania v. West Va.*, 262 U.S. 553, 593, 43 S.Ct. 658, 67 L.Ed. 1117 (1923)). And, the Court's decisions teach that the existence of a criminal law aimed specifically at one group of citizens, the enforcement of which has not been disavowed by the state, creates an injury that "is certainly impending" in the form of a

fear of prosecution and/or a constitutionally-suspect chilling effect. *See, e.g., Virginia v. American Booksellers Assn.*, 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (holding that booksellers had standing to bring a pre-enforcement challenge to a statute making it unlawful to knowingly display sexually explicit material in a manner accessible to juveniles because the law was aimed directly at the booksellers); *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (high school science teacher challenging the constitutionality of 1928 criminal law prohibiting the teaching of evolution found to have standing without any record of prosecutions under the law because the teacher was directly affected by the law).

These basic principles were applied to assess the standing of those who provide abortion services in *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). There, the Supreme Court held that physicians had standing to challenge a statute regulating abortion "despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes." *Id.* at 188, 93 S.Ct. 739. The Court explained, with a rationale that applies with equal force here, that:

> The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.

*Id.* Since *Doe*, the Supreme Court consistently has adhered to this principle and has held time and time again that a cognizable injury presents itself when a physician against whom an abortion statute operates lodges a constitutional attack against its enforcement. *See, e.g., Colautti v. Franklin*, 439 U.S. 379, 383 n. 3, 99

S.Ct. 675, 58 L.Ed.2d 596 (1979); *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 62, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *see also Diamond v. Charles,* 476 U.S. 54, 64, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). These decisions recognize that, in the parlance of *Babbitt,* the abortion provider is engaged in conduct "affected with a constitutional interest, but proscribed by a statute," and, therefore, a statute regulating abortion practice poses "a credible threat of prosecution."

■ Under this formulation, the Plaintiffs have standing to challenge the Act. All of them perform first trimester abortions, and Drs. Fitzhugh and Jones provide abortions to women well into their second trimester of pregnancy. The record establishes that the Plaintiffs engage in conduct which is "sheathed in a constitutionally-protected mantle." *Summit Medical Assocs., P.C. v. James,* 984 F.Supp. 1404, 1426 (M.D.Ala.1998). At least some of that conduct is proscribed by statute, because the Act's prohibitive sweep is triggered once the fetus is "living," which occurs at approximately ten weeks lmp. By its own terms, then, the Act applies so as to restrict the universe of pre-viability abortion methods that a physician may use, but the scope of its prohibition is not defined in terms with a generally accepted medical meaning or by the limits ("viability") set by *Casey.* Also, there are genuine doubts about the meaning of "delivers a living fetus ... into the vagina," "substantial portion thereof," and "kills the fetus,"

to highlight but a few of the Act's vagaries. The chilling effect attendant to leaving these uncertainties to restrict the Plaintiffs' conduct is sufficient to satisfy the "injury" requirement in this case. *See Grayned v. City of Rockford,* 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("Because overbroad laws, like vague ones, deter privileged activity, our cases firmly establish appellant's standing to raise an overbreadth challenge.").[26]

Moreover, as the persons and entities against whom the Act operates, the Plaintiffs assert a sufficiently direct threat of personal detriment. Plaintiffs fear that the Act—which, by its own terms, is not limited to late-term or D & X procedures—covers other commonly-used abortion methods. On the face of the Act, this interpretation is not an unreasonable one and, if it is correct, then Plaintiffs will have to curtail their practices significantly or risk criminal prosecution. *See American Booksellers Assoc.,* 484 U.S. at 392, 108 S.Ct. 636; *see also ACLU v. Reno,* 31 F.Supp.2d 473, 481 (E.D.Pa.1999) (plaintiffs had standing to challenge Child Online Protection Act (COPA), 47 U.S.C. § 231, even though defendant argued COPA should be construed to apply only to commercial pornographers, because "plaintiffs offer an interpretation of the statute which is not unreasonable, and if their interpretation of [COPA] is correct, they could potentially face prosecution for that content on their Web sites."). That is particularly true where, as here, plaintiffs

---

**26.** The nature of this "injury" is underscored by evidence that one of the defendants—the Commonwealth's chief law enforcement official—is amenable to an interpretation of the Act that transgresses constitutional boundaries. In a document entitled "Survey Response of Attorney General Jim Gilmore: Position on Abortion," defendant Gilmore issued the following statement during his gubernatorial campaign:

> My belief on the very serious issue of abortion laws has always been the same throughout my career. The laws of the Commonwealth of Virginia that permit abortions are too liberal. These laws permit abortion throughout the pregnancy

without regard for the unborn child. I have long supported changes to the laws including, but not limited to, parental notification, informed consent, and a 24-hour waiting period.... In addition, I support a ban on partial-birth abortions except when no alternative exists to protect the life of the mother.

I believe that when a baby is formed in the womb it should be protected. I believe this occurs when a combination of vital signs have occurred during the first 8–12 weeks. *Abortions should be prohibited after that time except to protect the life of the mother.* (Pls.' Ex. 3) (emphasis added.)

fear prosecution under a statute that is "recent and not moribund." *Doe*, 410 U.S. at 188, 93 S.Ct. 739; *see American Booksellers Assoc.*, 484 U.S. at 393, 108 S.Ct. 636.

Defendants maintain, however, that the Act is merely an effort "to close the gates before the storm enters the city" because no one in the Commonwealth performs the D & X that the Act was intended to prohibit. (Defs.' Ex. V at 20.) To that end, the Defendants point to the promises and representations made in the Attorney General's opinion letter, Governor's opinion letter, and Commonwealth's Attorneys' affidavits. The assurances contained therein are matters which are addressed in more detail *infra* in Part II.C; but, for the standing inquiry, the simple fact remains that the Defendants consistently have refused to disavow their intention to enforce the Act, both in general and against these plaintiffs in particular as to the abortion practices in which they engage. (Tr. at 271–73.)[27] And, of course, "[i]t would be unreasonable to assume the General Assembly adopted [the statute] without intending that it be enforced." *American Booksellers Assoc., Inc. v. Virginia*, 802 F.2d 691, 694 n. 4 (4th Cir.1986), *aff'd in relevant part*, 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); *see Mobil Oil Corp. v. Attorney General*, 940 F.2d 73, 76 (4th Cir.1991) ("We see no reason to assume that the Virginia legislature enacted this statute without intending it to be enforced.").

Virtually identical circumstances have led other federal courts to conclude that, even when the physician and clinic plaintiffs admitted to not providing the D & X procedure, the plaintiffs had standing to maintain a constitutional challenge to their state's partial birth abortion ban. *See, e.g., Causeway Medical Suite v. Foster*, 43 F.Supp.2d 604, 609–10 (E.D.La.1999);

*Planned Parenthood of Greater Iowa, Inc. v. Miller*, 30 F.Supp.2d 1157, 1163 (S.D.Iowa 1998); *Planned Parenthood of Central New Jersey v. Verniero*, 41 F.Supp.2d 478, 486–87 (D.N.J.1998); *Eubanks v. Stengel*, 28 F.Supp.2d 1024 (W.D.Ky.1998); *Daniel v. Underwood*, No. 2:98–0495, slip op. at 6–7 (S.D.W.Va. Nov. 5, 1998); *Summit Medical Assocs. v. James*, 984 F.Supp. 1404, 1425–30 (M.D.Ala.1998). In light of the controlling decisions of the Supreme Court and the well-reasoned opinions of these other federal courts confronted with the same issue, the Plaintiffs—physicians and clinics against whom the statute operates in the event that they procure an abortion that does not meet the statutory exceptions and conditions—have standing to challenge the Act. Contrary to the Defendants' urging, they "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe*, 410 U.S. at 188, 93 S.Ct. 739.

## B. PLAINTIFFS' CONDUCT AND THE SCOPE OF THE ACT

Notwithstanding this rather well-established jurisprudence respecting standing, and solely because the Plaintiffs do not now nor never have performed the D & X procedure, the Defendants contend that the *Babbitt* test is not met; that the recognition of abortion-provider standing in *Doe* and its progeny is not applicable; and that the numerous other federal and state courts which have found standing on similar records are in error. The linchpin of each contention is that, only under a strained reading of the statute, is the Act vague or does it sweep abortions, as performed by the Plaintiffs, within its ambit.

■ Of course, with this argument, the Defendants confuse the standing inquiry,

---

27. Not until January of this year, after the preliminary injunction hearing, after the trial, and after post-trial briefing, did counsel for the Defendants argue for the first time that the D & E procedures performed by the Plain-

tiffs are beyond the reach of the Act. (Tr.2d at 110.) This "Johnny-come-lately" assertion does not deprive the Plaintiffs of standing. *See infra* Part II.C.

the parameters of which are set forth by *Babbitt* and *Doe,* with a full-blown review of the merits of the case. This approach is flawed because a finding that plaintiffs have standing to bring an overbreadth and vagueness challenge does not amount to a resolution of the issue on its merits. *See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).[28] Thus, to address the Defendants' standing argument, it is necessary to assess the Act and the record regarding the practice of medicine as respects abortion, notwithstanding that to do so subsumes much of the analysis of the merits of the case. That endeavor therefore follows.

### 1. The Federalism and Comity Principles Which Circumscribe Statutory Construction

To begin, the Defendants argue that principles of federalism and comity dictate that the Court interpret the Act to proscribe only the procedure targeted by the General Assembly, the D & X, even though, at the same time, the Defendants argue that, properly interpreted, the Act proscribes both the D & X procedure as well as its current and future variants. That statutory interpretation contention is hard to follow because if, as the Defendants say, the Act applies to the D & X and all variants thereof, then per force it is not confined to the D & X procedure. Moreover, the record is that the D & X procedure itself is but a variant of the D & E procedure, so the interpretation of the Act given by the Defendants actually defeats their standing argument.

This rather awkward conundrum notwithstanding, the Court is obligated to construe state statutes (like the Act) to avoid constitutional difficulty whenever possible. *See McDonald v. Board of Election Commissioners,* 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). Principles of federalism also limit the effect of an overly narrow construction, however, because "such a ruling by a federal district court is not binding upon state courts." *Virginia Society for Human Life, Inc. v. Caldwell,* 152 F.3d 268, 270 (4th Cir.1998). As the Fourth Circuit explained in *Caldwell:*

> [A]n important difference between interpretation of a state statute by a federal court and by a state court is that only the latter interpretation is authoritative. If the district judge [reads the state's] statute so narrowly as to obviate all constitutional questions, it would still be possible for the state to prosecute people for violating the statute as broadly construed, because the enforcement of the statute would not have been enjoined.

*Id.* (quoting *Kucharek v. Hanaway,* 902 F.2d 513, 517 (7th Cir.1990)). Therefore, when tasked with construing a state law that implicates federally protected rights, a federal court must be cognizant that an overly narrow, yet non-authoritative, interpretation does not dispel the chilling effect of the statute's plain terms.

The federal court thus inevitably is confronted with competing considerations. On the one hand, our constitutional structure demands deference to the

---

28. Indeed, a rule of law that required, in the context of a void-for-vagueness challenge, the plaintiff to make a threshold yet conclusive showing that the statute under attack covers the plaintiff's conduct would preclude standing in every instance. That is because "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Id.* at 495 n. 7, 102 S.Ct. 1186 (quoting *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974)). And, as a matter of common sense, one to whose conduct a statute clearly does not apply surely has no standing; for example, a musician would have no standing to challenge a statute purporting to ban "partial birth abortions." Accordingly, standing must be vested in persons at whom the statute is directed—like the physicians and clinics here—because their conduct places them squarely at risk of the harm to constitutionally-protected rights which the void-for-vagueness doctrine aims to foreclose.

legitimate, yet unartful, efforts of state legislatures. On the other, statutory construction cannot be conducted in a vacuum, without due consideration of the probable effects of a narrowing construction. The constitutionally suitable resolution of these competing concerns is attained only by adherence to the principle that "federal courts are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Id.* (quoting *Boos v. Barry*, 485 U.S. 312, 330, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)); *see also Planned Parenthood of the Blue Ridge v. Camblos*, 155 F.3d 352, 383 (4th Cir.1998) (en banc) ("[T]he federal courts, as a matter of federalism and comity, should not sustain a facial challenge to a state statute that has yet to be construed by state courts, when a reasonable construction exists which would eliminate the constitutional infirmity."), *cert. denied*, —— U.S. ——, 119 S.Ct. 1031, 143 L.Ed.2d 40 (1999). Accordingly, in considering the scope of the Act to assess the Plaintiffs' standing, it is necessary to interpret the Act reasonably, but not so narrowly, as to ignore plain statutory terms that apply to the Plaintiffs, threaten them with prosecution, and chill the fundamental right to choose.

### 2. Analysis of the Act

The Act prohibits the knowing performance of a "partial birth abortion" not necessary to save the life of a mother. Section 18.2–74.2(D) defines "partial birth abortion," as set forth fully above. The starting point of the Defendants' interpretation, and the argument repeatedly urged upon the Court, is that the Act only criminalizes abortions in which the constituent elements of § 18.2–74.2(D) are performed as four distinct, sequential steps. According to Defendants, an abortion provider does not violate the Act unless he performs the following elements knowingly and in the following temporal sequence: (1) deliberate and intentional delivery of a living fetus, or a substantial portion there-

of, into the vagina for the purpose of performing a separate procedure the person knows will kill the fetus; (2) performance of the separate procedure; (3) killing the fetus; and (4) completion of the delivery. Otherwise, Defendants argue, the Act would be so broad as to proscribe most common abortion procedures. "Because of this sequencing requirement," they contend, "[t]he crucial point [for assessing a violation of the Act] is where the fetus is located not where the instruments are located when the killing blow occurs." (Stmnt.Comm. at 8.) Thus, they say, in a partial birth abortion, "the procedure used to kill the fetus must be separate from and subsequent to the procedure that delivers the fetus (or substantial portion thereof) into the vagina." (*Id.* at 11.)

The aspect of the Defendants' argument that the Act requires a separate killing sub-procedure makes too much of the word "procedure" in the first clause of the definition. In that respect, it must be remembered that all forms of abortion are medical procedures comprised of different acts which take place at various times from the beginning to the end of the abortion. All that is required by Section 18.2–74.2(D)'s first clause is that the abortion include killing conduct that occurs after the act of delivering the living fetus or a substantial portion thereof into the vagina. Nothing in the Act requires that conduct to be separate from the delivery into the vagina. Hence, that component of the Defendants' sequencing argument is rejected.

Turning to the rest of the Defendants' "sequencing" construction, nowhere does the Act state that the conduct which it proscribes is comprised of four distinct elements. Nor does the Act speak explicitly in terms of sequences. Unlike ACOG, which also has endeavored to define the Haskell procedure, the General Assembly chose not to clarify the definition of "partial birth abortion" by reference to "four elements" all of which must be "present in sequence." (Pls.' Ex. 2.) And, that deci-

sion, we are told, was a conscious one, because according to the Defendants, the General Assembly opted for a less precise definition so as to prevent physicians from circumventing the Act's reach. Thus, the Court is now asked to accept that the General Assembly deliberately omitted from the statutory definition of "partial birth abortion" the very language which, according to the Defendants, saves the Act from its most obvious constitutional defect, all the while aware that language like that used in the ACOG policy statement would have provided the necessary precision. Presented in that perspective, the Defendants' "sequencing" interpretation reeks of post-hoc rationalization by counsel.

Undesirable as that may be, it does not preclude a construction of the Act as imposing a sequencing predicate to its criminal proscription. That is because the Court is required to give the statute a reasonable construction, and a reasonable—though perhaps not the most reasonable—construction of the Act is that its structure, the order of its verbs, and its selected use of the future tense ("will kill") all contemplate an abortion procedure in which the physician performs each of the statutory elements in order.

Thus, to violate the Act, the physician first must deliver into the vagina at least a "substantial portion" of a living fetus "for the purpose of performing a procedure" that "will kill the fetus." Va.Code Ann. § 18.2–74.2(D). If that first element is accomplished, the Act is violated only if the physician then engages in an act which kills the fetus, and then completes the delivery. And, this "sequence" violates the Act only if done with the corresponding mens rea. Thus, the first element, delivery of the living fetus or substantial portion thereof, must be "deliberate[ ] and intentional[ ]" and it must be "for the purpose of performing a procedure the person knows will kill the fetus." *Id.* Each

of the steps must be performed "knowingly." *Id.* 18.2–74(A).

### a. The Act and the Suction Curettage and Induction Abortion Methods

So understood, the Act prohibits neither the suction curettage nor the induction method of abortion.[29] While it is true that, in all abortions, the physician sets out to do a procedure which he knows will kill the fetus, neither the suction curettage nor the induction methods require the physician, at the outset, to deliver intentionally part or all of the fetus into the vagina before performing an act which the physician knows will kill the fetus.

The suction curettage involves disassembly of the fetus in the uterus with a single, continuous suction procedure. (Pls.' Ex. 4A at 33.) The tearing apart of the fetus *in utero,* and not some subsequent act taken after a living fetus, or substantial portion of it, has been delivered into the vagina, kills the fetus in the suction curettage abortion. Although in the unusual suction curettage the fetus may come through the suction out of the uterus intact or largely intact, the physician has no control, and makes no effort to control, whether that occurs. (Pls.' Ex. 4A at 34.)

Meanwhile, in the typical induction abortion, the physician intends the delivery of the intact fetus into the vagina, but he does not do so with an eye towards performing an act to achieve fetal demise. Rather, the physician knows that, in the usual case, delivery—without more—kills the fetus because, by definition, the previability fetus cannot survive outside the mother's womb. (Tr. at 134; Pls.' Ex. 4A at 60.) The exception is when a complication during the induction necessitates additional action to facilitate delivery that the physician knows will result independently in fetal demise, *i.e.,* the use of forceps to crush the skull and bring the fetal head through the cervix. Like any other surgi-

---

**29.** It is not argued that the Act proscribes medical or surgical abortions so they will not be assessed against the text of the Act.

cal procedure, complications such as these during an induction are foreseeable. (Tr. at 135–36; 333–34.) The Act, however, requires more than mere foreseeability. On this record, it appears that the crushing of the skull to complete the induction, although foreseeable, is not intended at the outset of the induction abortion. Hence, on this record, the induction method of abortion likewise is not prohibited by the Act.[30]

This interpretation of the Act, as well as its ramifications, finds support in the decision in *Eubanks v. Stengel,* 28 F.Supp.2d 1024 (W.D.Ky.1998), a case involving Kentucky's "partial-birth abortion" ban. There the district court struck the Kentucky statute, which was virtually identical to Virginia's Act, on the ground that its overbreadth imposed an undue burden on women's right to choose. Before explaining why the statute transcended constitutional boundaries, however, the court first explained two ways in which it did not:

> [T]he Act most certainly does not prohibit two commonly used procedures—suction and curettage, and induction. In the suction and curettage or vacuum aspiration, the act itself of suctioning out the fetal tissue kills the fetus. No subsequent or separate procedure is needed to kill the fetus. The physician does not expect the fetal tissue to be "living" upon suctioning from the uterus. Thus, at several basic levels suction and curettage falls outside the Act's definition. The induction procedure likewise is not prohibited. Although induction includes vaginal delivery, the delivery itself kills the fetus on virtually every occasion,

either prior to the fetus' entering the vagina, or while there because the induced contractions cut off the supply of oxygen. No separate act by the physician is anticipated or required.

*Id.* at 34.[31]

■ Here, as in *Eubanks,* a reasonable construction of the Act excludes suction curettage · and induction from its reach. But, before turning to the record respecting the D & E method, the limited import of these preliminary conclusions bears emphasis. While they certainly have implications for the Plaintiffs' overbreadth attack, *see infra* Part III, an interpretation that excludes the suction curettage and induction methods from the Act's scope does not per force preclude the Plaintiffs' vagueness challenge, or any aspect of it. "A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process." *Village of Hoffman Estates,* 455 U.S. at 497, 102 S.Ct. 1186. Second, as explained above, the "sequencing" interpretation of the Act results from canons of construction that urge deference to the Defendants' interpretation. But, those canons, dictated by our federalism, have their limits; and rewriting a statute to eliminate vagueness is beyond that limit and thus is not constitutionally permissible. *See Caldwell,* 152 F.3d at 270; *Verniero,* 41 F.Supp.2d at 487.

### b. The Act and the D & E Method

With those caveats, it is appropriate to complete the analysis of the Act and, in so

---

**30.** If, however, the induction is commenced with the knowledge that the fetal head is too large to pass through the cervix without crushing the skull, then the induction abortion too would be proscribed by the Act. The record here does not disclose whether standard medical practice enables the physician to know at the outset of the induction abortion (*e.g.,* by ultrasound) whether the fetal head will pass through the cervix. Nor does the record establish with what frequency this apparently infrequent complication arises ·and whether foreseeability may be converted to knowledge and intent (if the frequency is

great). Absent evidence on these points, it cannot be said that the Act covers the induction abortion.

**31.** The induction finding in *Eubanks* ("the delivery itself kills the fetus on virtually every occasion") suggests that the record on the need for crushing the skull during this procedure was different then it is here. (Tr. at 135–36, 333–345.) Hence, the Court cannot subscribe completely to the *Eubank's* court's finding. *See supra* n. 30. However, on this record, the result is the same.

doing, to consider the remainder of Defendants' standing argument. The Act's definition of partial birth abortion is purposefully broader than the medical descriptions of the D & X because, say the Defendants, the General Assembly intended to encompass "variations of the D & X procedure, including those that may be as-yet unidentified and/or uninvented." (Stmnt.Comm. at 4.) As will be seen, in this effort to cast a broad net, the General Assembly has prohibited procedures that often are the deliberately performed, intended consequences of a D & E performed at the later stages of pregnancy, particularly those past eighteen weeks lmp. The physician-plaintiffs therefore have established their standing under the Defendants' approach to that doctrine.

The starting point is the term "substantial portion thereof." In the context of the suction curettage abortion, this term had little impact because only unintentionally does any significant part of the fetus, apart from disarticulated tissue, pass through the suction cannula. The phrase was similarly irrelevant for purposes of the induction method because, in that method of abortion, the intention usually is to deliver a fetus entirely intact. The D & E abortion at later gestations, however, falls somewhere in between, and in that context, the undefined meaning of "substantial portion" takes on an outcome-determinative role in the Plaintiffs' overbreadth challenge and, as set forth in Part IV, also in their vagueness challenge.

Defendants variously argue that the term "substantial portion" means "[s]ome portion of the trunk" in addition to "just fetal limbs," (Stmnt.Comm. at 7), "some portion of the head" in a vertex presentation, (id. at 7 n. 6), and that its "core meaning" is "delivery of the fetus up to its head." (Defs.' Post–Tr.Br. at 19.) Adding to the confusion is the testimony of Defendants' own witnesses, who have testified that a "substantial portion" is a third of the fetus, (P.I.Tr. at 248), half the fetus, (Defs.' Ex. K–2 at 73), the thorax, (Defs.'

Ex. L at 34), or the fetal head, (Tr. at 428.) Defendants' witnesses also have conceded that term may include a quarter of the fetus, (P.I.Tr. at 282), a fetal limb, (Defs.' Ex. K–2 at 77), or a third of the fetus, (id. at 75–76).

A dictionary excursion is of little help. The word "substantial" means "something having substance or actual existence . . . something of moment . . . an important or material matter." Webster's Third New International Dictionary 2280 (1986). The word "portion" is defined as "a part of a whole . . . a limited amount or quantity." Id. at 1768. Thus, as the district court in Kentucky observed: "the Court cannot say precisely what might comprise a substantial portion of a fetus measuring between nine and twelve inches in length and weighing between one and two pounds. Neither can physicians." Eubanks, 28 F.Supp.2d at 1034.

These vagaries in the term "substantial portion" contribute significantly to the Act's reach—overbreadth—when considered in conjunction with the record respecting D & Es performed by the Plaintiffs and others at approximately eighteen weeks lmp. Mindful of the risks of perforation and infection that increase with every intrusion of the forceps into the uterus, many physicians begin the D & E procedure during the later stages of a pre-viability pregnancy with the dual goals of (i) removing as much of the fetus as possible through the cervix and into the vagina; and (ii) of performing any necessary disarticulation there, rather than starting the D & E with the intention of in utero disassembly. (Tr. at 55–59, 145; Pls.' Ex. 4A at 47–48; P.I.Tr. at 51–59, 75–78.) After the initial application of suction which ruptures the amniotic sac, the physician introduces grasping forceps into the uterine cavity and is able to bring a lower extremity, both, part of the torso, or perhaps in the case of a vertex presentation, the head, out of the uterus and through the cervix. (Tr. at 145–46; Pls.' Ex. 4A at 45; P.I.Tr. at 51–58.) At least one witness has identified

each of these parts as a "substantial portion." Occasionally the dilation of the cervix is such that the physician is able to remove the entire intact fetus; more often, however, the physician must detach the substantial portion of the fetus brought down through the cervix or crush the fetal skull and then make another pass with the forceps. (Tr. at 145; P.I.Tr. at 51, 58.) No matter which is the case, the fetus generally is still "living" at this point in the sense that it has a heartbeat.[32]

The record therefore establishes that, at later gestational ages (18 to 20 weeks lmp), the physician performing the D & E "deliberately and intentionally delivers a living fetus or a substantial portion thereof into the vagina." To be sure, there is an element of uncertainty involved because the physician does not know whether he ultimately will be able to deliver the fetus intact or piecemeal, and he cannot predict with certainty whether the locus of disarticulation, if any, will be inside the uterus or in the vagina. But, far from mere happenstance, the physician's delivery of the intact fetus, or a substantial portion thereof (by whatever definition), into the vagina before disarticulation and before subsequent forays with the forceps often is both the deliberate and intended result. As explained by Dr. Hausknecht, the physician is driven by concern for maternal safety:

> [A]s one goes deeper into pregnancy . . . your goal is to do it quickly and to do . . . as little damage, if no damage at all, to maternal anatomy. The less one does blindly inside the uterus, the better. Sometimes you can't do that. Sometimes you have to deconstruct or disassemble the fetus within the uterus, because no matter how you try, you can't do otherwise. Other times you may be able to, by gently pulling on the lower extremities, bring the torso into the cervix.

(P.I.Tr. at 51–52.) Drs. deProsse and Stubblefield gave testimony to the same effect. (Tr. at 155; Pls.' Ex. 4A at 47–51, 55.)

The other mens rea requirements that accompany the Act's first step also are met during later stage D & Es. At the outset, the physician knows of the near-certain likelihood that, to empty the uterus, he will have to crush the fetal head or avulse part of the fetus, whether it be the umbilical cord, either or both extremities, the torso, or the head, after partial delivery into the vagina. Any of these acts, the physician knows, will kill the fetus. (Tr. at 55–56, 58–59, 141, 145, 147; Pls.' Ex. 4A at 48.) Thus, the deliberate and intentional delivery of the living fetus, or a substantial portion thereof, during later stage D & Es is, without a doubt, "for the purpose of performing a procedure the person knows will kill the fetus."

Having completed the Act's first step, the remaining three fall into place sequentially. The physician "performs the procedure" during the D & E when he disarticulates the fetal limb or trunk or crushes the skull, as the case may be. Va.Code Ann. § 18.2–74.2(D). The physician assumes, based on his experience, that the fetus was living before that point, and he knows that any one of these acts "kill[ ] the fetus." (Tr. at 55–59, 148, 152; Pls.' Ex. 4A at 42, 46, 48.) Then, the physician "completes the delivery" by removing the remaining fluid and fetal tissue from the woman's body. (Tr. at 55; Pls.' Ex. 4A at 41.)

Defendants fault this construction because, they contend, the Act's third element—"kills the fetus"—means "actual fetal death, not the procedure by which that death is accomplished." (Defs.' Post–Tr. Br. at 15.) To put it differently, under the Defendants' proposed interpretation, the second element ("performs the procedure")

---

**32.** The initial application of suction does not result in fetal death. And, even in those cases, occurring approximately one-half the time, in which the initial suction removes the umbilical cord along with the amniotic fluid from the uterus, fetal death does not follow immediately. (Tr. at 144–45.)

and third element ("kills the fetus") are met only when they follow in rapid succession, if not instantaneously. Accordingly, the Defendants contend that the Act proscribes only the paradigm "partial birth abortion" whereby the suctioning of intracranial contents causes almost instantaneous fetal death. (*Id.* at 16.) Meanwhile, they argue the Act does not reach other D & Es because the acts that undeniably cause death there—the severing of the umbilical cord, the avulsing of a limb or head, or crushing the skull—do so only after some brief, albeit indeterminate, lapse of time.

This interpretation is flawed and, therefore, it is rejected. First, Defendants' proposed construction has no basis in the language of the Act. The plain meaning of the statutory phrase "kills the fetus" does not admit of construing it to mean "instantaneous fetal death," because the statutory phrase contains no temporal restriction at all. The plain meaning of the Act is violated if (assuming violation of the rest of its terms) the procedure kills the fetus instantaneously or later.

Second, and more fundamentally, equating the term "kills the fetus" with "instantaneous fetal demise" makes little sense in perspective of the record respecting actual abortion practice. For example, if the Defendants' interpretation were accepted, the Act would criminalize only those abortions in which the so-called "sub-procedure"

knowingly effectuated immediate fetal death.[33] Then, the Act would fail to outlaw even the D & X. Evacuation of the intracranial contents does not in every case cause instant fetal death, as Dr. deProsse explained:

Q. Over what period of time, if you know, would partial evacuation of the skull result in fetal death?

A. That again would depend upon just what part of the brain tissue was interrupted. If the portion of the brain which involved cardiac activity was involved, it would be more immediate. If just the cerebrum was involved, then it would be somewhat delayed.ˊ

(Tr. at 159.)[34] Furthermore, under the Defendants' interpretation of "kills the fetus," a physician intending to do a D & X could avoid the Act merely by facilitating delivery from the woman's body by crushing the fetal skull, instead of evacuating the skull contents with suction. The Defendants' own witness, Dr. Giles, explained that crushing the fetal skull does not necessarily cause immediate fetal death. (Tr. at 405–06.) Dr. Stubblefield expressed a similar view. (Pls.' Ex. 4A at 46–47.) Thus, independent of its inconsistency with the statutory text, the Defendants' interpretation of "kills the fetus" undercuts completely the General Assembly's supposed goal of prohibiting the D & X and "potential variants thereof."[35] Such an

---

33. The Act is structured so that the "knowingly" mens rea in § 18.2–74.2(A) modifies each of the four elements of "partial birth abortion," which is defined in § 18.2–74.2(D). *See generally United States v. Wilson,* 133 F.3d 251, 260–64 (4th Cir.1997).

34. Dr. deProsse's personal experience with abortion procedures in which he has partially evacuated cranial contents renders his testimony on this score particularly credible. (*Id.*)

35. The Defendants selectively ignore this shortcoming of their proposed construction in the affidavits submitted by the six Commonwealth's Attorneys to appease the Plaintiffs' fears of prosecution. Those affidavits express

the opinion that the Act prohibits the D & X, defined as a technique "in which the physician, rather than removing the fetus in parts, removes it from a breech position intact up to the head, and then, if necessary, reduces the size of the head (*by collapsing the calvarium using forceps or evacuating its contents using suction* ) to remove the intact fetus the rest of the way." (Defs.' Exs. R–1 to –6 ¶ 4(e) (emphasis added).) Surely those affidavits are not operating under the same interpretation of "kills the fetus" now advanced by the Defendants, because the testimony of Drs. Stubblefield and Giles demonstrated that "collapsing the calvarium using forceps" does not cause immediate fetal death.

The affidavits are discussed in greater detail *infra* in Part II.C.

interpretation must be rejected in favor of a more common-sense construction that, at least, proscribes the Haskell procedure. In the context of the Act, a physician "performs a procedure, [and] kills the fetus" when he knowingly takes an action that is certain to cause fetal death, and, in fact, does cause fetal death, even if the fetal heartbeat does not cease instantaneously with the killing blow. So understood, the Act prohibits the D & X described by ACOG and Dr. Haskell. So understood, the Act also prohibits many D & Es.

In sum, a comparison of each of the four elements of the Act against the record respecting the D & E method of abortion demonstrates that the Act covers many D & E procedures, particularly as they are performed after eighteen weeks lmp. Drs. Fitzhugh and Jones perform D & E abortions at that stage, and the procedures to which they testified are consistent with the descriptions provided by other experts. For example, Dr. Fitzhugh explained that, in a second trimester D & E, "the intent is to remove the fetus into the vagina." (P.I.Tr. at 128.) At twenty weeks lmp, Dr. Fitzhugh testified that up to the half the time he successfully brings a living fetus or substantial portion of it into the vagina for the purpose of taking any one of a number of subsequent steps that he knows will cause fetal demise. (Tr. at 55–56, 59; P.I.Tr. at 127.) Dr. Fitzhugh then "performs the procedure" and "kills the fetus," *i.e.*, he severs the umbilical cord or disarticulates limbs from the fetal body, acts which cause fetal death. (Tr. at 56–58, 107; P.I.Tr. at 127.) Finally, Dr. Fitzhugh completes the delivery by checking the uterine cavity for remnant placenta or tissue. In short, Dr. Fitzhugh intends to perform a procedure prohibited by the Act each time he commences a D & E abortion at approximately eighteen weeks lmp, although circumstances may prevent the performance of the D & E as intended.

Because the record establishes that the Act covers at least some of the procedures performed by Drs. Fitzhugh and Jones, those Plaintiffs are not deprived of standing even under the Defendants' approach to that doctrine.

## C. THE DEFENDANTS' ASSURANCES NOT TO PROSECUTE

The foregoing record notwithstanding, the Defendants argue that there exists no "credible threat of prosecution" because the Attorney General, the Governor, and the six Commonwealth's Attorneys who are defendants in this action each have provided assurances that, *inter alia*, they interpret the Act to not cover "conventional" D & E procedures. Of course, the State's intent to enforce the challenged provision often is relevant when assessing a plaintiff's standing. *See Babbitt*, 442 U.S. at 302, 99 S.Ct. 2301; *Poe v. Ullman*, 367 U.S. 497, 507, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). For the reasons that follow, however, nothing in the proffered assurances dispels the credible threat of prosecution, established by the record, that confers standing upon these plaintiffs.

In a letter to the Hon. Stephen D. Newman of the Senate of Virginia dated April 30, 1998, the Attorney General offered his opinion that the Act does not prohibit a "conventional dilation and evacuation," which the Attorney General defined by quoting the district court's decision in *Evans v. Kelley*, 977 F.Supp. 1283, 1293 (E.D.Mich.1997):

> Usually in a conventional D & E, the physician removes the dilateria from the cervix, then ruptures the membranes, and dismembers the fetus in the uterine cavity using sharp instruments such as forceps, and suction. He then removes the fetal parts by pulling them out piece by piece through the cervical os.

(Defs.' Ex. Q.) The Attorney General also opined that "incidental protrusion" of some part of the fetus from the cervical os before death has occurred would not transform a D & E into a "partial birth abortion" within the meaning of the Act. (*Id.*) The six defendant—Commonwealth's At-

torneys, expressly relying on the Attorney General's opinion letter and the *Evans* definition of conventional D & E cited therein, have executed affidavits to a similar effect. (Defs.' Ex. R–1 to –6.) Also in evidence is a letter from Governor Gilmore to William W. Davenport, Chairman of the Commonwealth's Attorneys Services Council, which states "[a]s Governor, I concur with the interpretation of the Act represented by the Attorney General's Opinion and the Commonwealth's Attorneys Declarations." (Defs.' Ex. E.) Of these several representations and assurances, only the opinion of the Attorney General pre-dates the commencement of this lawsuit.

Upon review of the record, it becomes apparent that these assurances provide no assurance at all. The most obvious deficiency is that, in light of the record at trial, there remain abortion procedures performed by the Plaintiffs and others in the second trimester that fall within the plain language of the Act but not within the Defendants' narrow definition of "conventional D & E." Particularly at later gestations, the physician intends to bring as much of the fetus as dilation will allow out of the uterus and through the cervix, rather than disassembling the fetus *in utero* and removing parts piece by piece. Indeed, as Dr. Hausknecht explained, physicians prefer this procedure because it is safer for their patients. (P.I.Tr. at 51, 58–59.) As a result, later term D & E abortions often involve more than what the Defendants term the "incidental protrusion" of a fetal limb. Thus, neither the *Evans* definition nor the interpretive gloss of it offered by the Commonwealth's Attorneys and the Attorney General has the effect of removing the Plaintiffs' conduct from the Act's proscriptive reach. The opinion letters and affidavits simply miss the point that is proved by the record.

Even if the Defendants' representations and assurances had the potential of alleviating all of the Plaintiffs' concerns, standing would not be abated. The fact remains that nearly all of these documents—the six affidavits and the Governor's letter—are products of, and not precursors to, this litigation. As such, they technically do not affect the standing inquiry at all because standing is measured at the time the action is filed. *See* Erwin Chemerinsky, *Federal Jurisdiction* 126 (3d ed.1999). Rather, the effect of those documents, if any, is to raise questions of mootness and voluntary cessation.

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Where the defendant voluntarily ceases the conduct at issue, the test for determining whether a claim is moot is a "stringent one." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n. 10, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203–04, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). The Supreme Court has explained that "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *Id.* A case is not moot, therefore, unless it becomes "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Concentrated Phosphate Export Ass'n*, 393 U.S. at 204, 89 S.Ct. 361; *see Telco Communications, Inc. v. Carbaugh*, 885 F.2d 1225, 1231 (4th Cir.1989). The defendant carries the heavy burden of making this showing. *See* 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3533.7, at 350 (1984).[36]

---

**36.** One possible explanation for this heavy burden is the suggestion that, unlike Article III's requirement of standing, the mootness doctrine is more prudential in nature and not grounded in constitutional precepts at all.

*See Honig v. Doe*, 484 U.S. 305, 329–33, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (Rehnquist, C.J., concurring). But, this view has not been embraced by a majority of the Supreme Court, and courts generally deem the moot-

To the extent that the Defendants' assurances can be read to exclude Plaintiffs and others similarly situated from prosecutions under the Act, the mootness issue presented here is analogous to claims of mootness grounded in a defendant's "voluntary cessation" of challenged conduct. *See Summit Medical Assocs., P.C. v. James,* 984 F.Supp. 1404, 1430 (M.D.Ala. 1998); *Daniel v. Underwood,* No. 2: 98–0495, slip op. at 5 (S.D.W.Va. Nov. 5, 1998). For the reasons that follow, the Defendants have failed to meet their burden of establishing the permanence of their non-binding representations.

First, the present intention of the Commonwealth's Attorneys not to prosecute for certain procedures is subject to change because nothing binds the Commonwealth's Attorneys to their current personal interpretation of the statute. Nor should they be so bound. This is not the case where the parties have entered a settlement, or where the defendant has "entered into a binding, judicially enforceable agreement" not to prosecute. *Kidder, Peabody & Co. v. Maxus Energy Corp.,* 925 F.2d 556, 563 (2d Cir.1991) By contrast, the Defendants' assurances, though in the form of sworn affidavits, are nonbinding unilateral pronouncements concerning the scope of the Act. The Court's refusal to treat them otherwise stems not from any assumption of bad faith on behalf of the Commonwealth's officials, but rather from adherence to Supreme Court principles that "[w]ell-intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law," *Baggett v. Bullitt,* 377 U.S. 360, 373, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), and that "experience teaches us that prosecutors too are human," *Cramp v. Board of Public Instruction,* 368 U.S. 278, 287, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961). *See also Keyishian v. Board of Regents,* 385 U.S. 589, 599, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ("It is no answer to say that the statute would not be applied in such a case.").

That is no less true in the context of a criminal abortion statute, where the morally and politically divisive nature of the subject matter reasonably can be expected to influence prosecutorial discretion. *See James,* 984 F.Supp. at 1431 (discounting directive of State's attorney general to refrain from prosecutions under partial birth abortion statute except under limited circumstances); *see also Karlin v. Foust,* 975 F.Supp. 1177, 1201 (W.D.Wis. 1997).[37] Nor can the law enforcement officials in Virginia, where the morality of abortion assumes a powerful and divisive role in political contests and public debate, be considered exempt from such pressures.[38] In that regard, it is also signifi-

---

ness doctrine to stem from Article III's case or controversy requirement.

**37.** *Karlin* concerned the constitutionality of a Wisconsin law that regulated the process by which physicians obtained voluntary and informed consent from patients seeking abortions. In response to the defendants' arguments that the physicians and clinic plaintiffs lacked standing, the district court stated:

Politically savvy district attorneys in counties with anti-abortion constituencies might see such suits as beneficial to their careers. Other district attorneys may have strong philosophical opposition to abortion and be inclined to prosecute to further their personal beliefs. Moreover, abortion opponents could take a long step to erasing a woman's right with a few key prosecutions of the state's small group of abortion providers. As both pro-choice and pro-life ad-

vocates are well aware, if abortions are not available, the right to choose becomes hollow. In sum, plaintiffs have standing to assert that [the statute] violates their own constitutional rights *See Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745–46, 35 L.Ed.2d 201 (1973).

*Id.* at 1201–02. These observations have pertinence here.

**38.** *See, e.g.,* Tyler Whitley, *Candidates Debate Abortion: Dolan and Earley Trade Charges, Defend Positions,* Rich. Times–Disp., June 22, 1997, at C1; *Campaigns Keying on Abortion Issue,* Rich. Times–Disp., Sept. 1, 1991, at D3; Alison Howard, *Abortion Debate Enters as Third Force in Va. Governor's Race,* Wash. Post, Oct. 13, 1989, at B1. Few issues excite the kind of political activity and pressure as does the abortion question, and Virginia is home to two of the nation's most politically

cant that, in Virginia, the sovereign is not readily subject to estoppel. *See Halberstam v. Virginia*, 251 Va. 248, 252, 467 S.E.2d 783, 785 (1996); *Virginia v. Allstate Bonding Co.*, 246 Va. 189, 194, 435 S.E.2d 396, 399 (1993).

Second, the affidavits reflect a fundamental misunderstanding on the part of the affiant-Defendants as to what the record in this action has demonstrated that the Plaintiffs and others similarly situated actually do when performing pre-viability abortions. When compounded with the Defendants' position, asserted repeatedly, that the Act is constitutional and enforceable against not only the D & X but also "variations ... that may be as-yet unidentified and/or uninvented," (Stmnt.Comm. at 4), it is not "absolutely clear" that the Act could not reasonably be expected to be enforced against the Plaintiffs or other physicians who perform similar abortion procedures some time in the future. To the contrary, the threat of prosecution appears very credible indeed.[39]

Other courts have not been swayed by promises not to prosecute similar to those presented here, particularly where the record reflected that the defendants' assurances did not encompass the breadth of the challenged provision. For example, in *ACLU v. The Florida Bar*, 999 F.2d 1486 (11th Cir.1993), the plaintiff, a candidate for elected judicial office, brought a First Amendment challenge to a canon of judicial conduct that he believed would proscribe a campaign speech that he wished to make. The defendants responded in court papers that the canon could not be applied constitutionally to the plaintiff's proposed speech, but insisted that the rule

itself was constitutional. Finding that there was standing and that the case was not moot, the Eleventh Circuit explained:

> [I]t would be an anomalous result if the Bar and the JQC were permitted to (1) maintain that Canon 7(B)(1)(a) is constitutional and enforceable and yet, if [the plaintiff] or another judicial candidate in [the plaintiff's] position were to seek pre-enforcement review, to (2) again come into court saying, "Canon 7(B)(1)(a) does not apply to that proposed speech." This process itself, aside from the canons and the rules, is enough to chill speech.

*Id.* at 1495. And, in the context of a partial birth abortion statute, the district court in *Eubanks* held that:

> Defendants' assurances are particularly unconvincing given their admission that the terms of the statute reach something more than a D & X and given the legislature's clear intent to have a definition somewhat broader than one limited to the D & X. Defendants place themselves in the untenable position of asserting that the Act is constitutional as drafted, while simultaneously saying that they will not enforce the Act to its full scope.

*Eubanks*, 28 F.Supp.2d at 1039.

Statements such as those found in *ACLU* and *Eubanks* provide the rule, not the exception. *See Gardner*, 99 F.3d at 15 (finding justiciable claim despite defendant's assurance that statute did not prohibit plaintiffs' activity because "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict [protected] activity by the class to which the plaintiff belongs, courts will assume a

---

powerful and active anti-abortion organizations. The courts cannot turn a blind eye to these realities; but, of course, those realities are not determinative of enforcement policy.

**39.** The assertion that there is no reasonable possibility that the Act would be so enforced is belied further by the facts that (1) by its own terms, the Act applies pre-viability to pregnancies that have reached approximately

10 weeks lmp, and (2) Governor Gilmore, in a campaign statement entitled "Position on Abortion," expressed the following views: "I believe that when a baby is formed in the womb it should be protected. I believe this occurs when a combination of vital signs have occurred during the first 8–12 weeks. Abortions should be prohibited after that time except to protect the life of the mother." *See supra* n. 26.

credible threat of prosecution in the absence of compelling contrary evidence"); *United Food and Commercial Workers International Union, AFL—CIO v. IBP, Inc.,* 857 F.2d 422, 429 (8th Cir.1988) (rejecting defendants' affidavits eschewing prosecution as " 'no more than a hesitant, qualified, equivocal and discretionary present intention not to prosecute,' the clear implication of which was that the state's position could well change") (quoting district court finding). Accordingly, the Defendants' assurances in this case neither deprive the Plaintiffs of standing nor render this case moot; and the Plaintiffs are entitled to a determination of the Act's constitutionality on the merits.[40]

### D. CONCLUSION: AS TO STANDING

"The conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy' within the meaning of Art. III." *Diamond v. Charles,* 476 U.S. 54, 64, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). The record in this case establishes that, at a minimum, Drs. Fitzhugh and Jones have demonstrated such a controversy. As physicians who perform abortion procedures, Drs. Fitzhugh and Jones can assert both their own constitutional claims as well as those of their women patients. *See Singleton v. Wulff,* 428 U.S. 106, 115–16, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). And, because these two plaintiffs have standing to pursue all aspects of

the asserted challenges, no need exists to assess the standing of the other plaintiffs under the Defendants' approach. *See Babbitt,* 442 U.S. at 299 n. 11, 99 S.Ct. 2301; *Carey v. Population Servs. Int'l,* 431 U.S. 678, 682, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977).

To the merits of those challenges, the Court now turns.

### III. INTERFERENCE WITH THE FUNDAMENTAL RIGHT TO CHOOSE TO HAVE AN ABORTION: *ROE* AND *CASEY*

Plaintiffs' initial challenge to the Act focuses on its purported infringements upon the constitutional right to choose an abortion, first enunciated in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and most recently refined in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). For the reasons that follow, the Court finds that the Act unconstitutionally intrudes upon the abortion rights protected by those decisions in two significant respects. First, the plain language of the Act applies before viability and encompasses many common D & E procedures. This overbreadth places a "substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" and amounts to an undue burden. *Id.* at 877, 112 S.Ct. 2791. Second, the Act runs afoul of the law governing state regulation of post-viability

---

**40.** Because the record demonstrates that, at a minimum, the Act prohibits procedures performed by Drs. Fitzhugh and Jones, and because neither the opinion letters nor affidavits are capable of altering the statutory language, it is not necessary for the Court to reach the Plaintiffs' other asserted basis for standing: Dr. Fitzhugh's alleged desire to perform the D & X. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."). It should be noted, however, that a review of Dr. Fitzhugh's testimony indicates more than a "some day inten-

tion" to perform the D & X procedure. *See id.* Dr. Fitzhugh has been asked by patients in the past to perform an abortion that would result in a largely intact fetus. (Tr. at 62.) Dr. Fitzhugh testified that, in the future, he would perform the D & X procedure if the law permitted and if that procedure would be in the best interests of the patient. (Tr. at 63, 85); *see also Planned Parenthood of Wisconsin v. Doyle,* 162 F.3d 463, 465 (7th Cir.1998) (plaintiffs' standing to challenge partial birth abortion statute "not open to question" where physicians who did not presently perform the D & X "would like the option to consider performing it should the condition of the patient so warrant.").

abortions. At that point in gestation, the State's interest in fetal life is far more compelling and the woman's privacy interest less so; however, the Supreme Court has made clear that, even then, the State still may not proscribe abortion without an exception for procedures that are "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 879, 112 S.Ct. 2791 (quoting *Roe,* 410 U.S. at 164–65, 93 S.Ct. 705). The Act contains no health exception and an inadequate life exception and, therefore, it is invalid for these additional reasons.

### A. STANDARD OF REVIEW APPLICABLE TO THE PLAINTIFFS' FACIAL CHALLENGE

The parties first dispute whether the appropriate standard for a challenge to the facial constitutionality of an abortion law is the virtually insurmountable test set forth in *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The Defendants urge the application of the *Salerno* test, arguing that a State statute, including a law limiting abortion, is invalid on its face only if "no set of circumstances exists under which the Act would be valid." 481 U.S. at 745, 107 S.Ct. 2095. The Plaintiffs, however, contend that an abortion law cannot survive a facial challenge if the evidence demonstrates that "in a large fraction of the cases in which [the abortion law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey,* 505 U.S. at 895, 112 S.Ct. 2791.

In *Salerno,* the Supreme Court observed that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Salerno,* 481 U.S. at 745, 107 S.Ct. 2095. The Supreme Court applied the *Salerno* "no set of circumstances" test in two pre-*Casey* facial challenges to abortion laws. *See Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452,

1457 (8th Cir.1995) (citing *Rust v. Sullivan,* 500 U.S. 173, 182–84, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) and *Webster v. Reproductive Health Servs.,* 492 U.S. 490, 524, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989)). But, in *Casey,* the Supreme Court assessed the facial challenge to the Pennsylvania law by using a different standard. Rejecting the State's assertions that the spousal notification requirement "impose[d] almost no burden at all for the vast majority of women seeking abortions" and that "the effects of [the requirement] are felt by only one percent of the women who obtain abortions," the *Casey* joint opinion explained that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." 505 U.S. at 894, 112 S.Ct. 2791. Accordingly, the joint opinion went on to hold, if the abortion law, "judged by reference to those for whom it is an actual ... restriction," "operate[s] as a substantial obstacle to a woman's choice to undergo an abortion[,]" then the law "is an undue burden, and therefore invalid." *Id.* at 895, 112 S.Ct. 2791.

Since *Casey,* most courts to have reached the issue have held that *Casey* supplants *Salerno* in the abortion context. *See Planned Parenthood of Southern Ariz. v. Lawall,* 180 F.3d 1022, 1027 (9th Cir. 1999) (joining "the great weight of circuit authority holding that *Casey* has overruled *Salerno* in the context of facial challenges to abortion statutes"); *Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187, 195–96 (6th Cir.1997) ("We hold that this circuit should 'follow what the Supreme Court actually did—rather than what it failed to say—and apply the undue burden test' without regard to *Salerno.*") (citation omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998); *Jane L. v. Bangerter,* 102 F.3d 1112, 1116 (10th Cir.1996) (holding that the correct standard "after *Casey* is the 'undue burden' standard applied by the Court in that case"); *Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452, 1456–

58 (8th Cir.1995) (holding that *Casey* "effectively overruled *Salerno* for facial challenges to abortion statutes"); *Verniero,* 41 F.Supp.2d at 498–99 (holding in challenge to partial birth abortion statute that the plurality decision in *Casey* displaced *Salerno* in abortion cases); *Little Rock Family Planning Servs., P.A. v. Jegley,* No. 97–581, slip op. at 45–46 (E.D.Ark. Nov. 13, 1998) (same); *Eubanks,* 28 F.Supp.2d at 1030 & n. 5 (same); *Hope Clinic v. Ryan,* 995 F.Supp. 847, 859–60 (N.D.Ill.1998) (same); *Wicklund v. Lambert,* 979 F.Supp. 1285, 1287 (D.Mont.1997) (applying the *Casey* standard of review in an action contesting the facial validity of an abortion statute containing a parental consent provision); *see also Casey v. Planned Parenthood of Southeastern Pa.,* 14 F.3d 848, 863 n. 21 (3d Cir.) (noting in *dicta* that "the Court has, in this case, set a new standard for facial challenges to pre-viability abortion laws.... *Casey* requires only that a plaintiff show an abortion regulation would be an undue burden 'in a large fraction of the cases' ") (quoting *Casey,* 505 U.S. at 895, 112 S.Ct. 2791), *stay denied,* 510 U.S. 1309, 114 S.Ct. 909, 127 L.Ed.2d 352 (1994); *Dorf, supra,* at 272–79 (noting that even before *Casey,* the Supreme Court did not apply *Salerno* to statutes regulating abortion). *But see Barnes v. Moore,* 970 F.2d 12, 14 n. 2 (5th Cir.1992) ("[W]e do not interpret *Casey* as having overruled, *sub silentio,* longstanding Supreme Court precedent governing challenges to the facial constitutionality of statutes.").[41]

The Fourth Circuit, however, has not yet decided "whether, in *Casey,* the Supreme Court *sub silentio* overruled its decision in *Salerno* on the standard of review applicable to facial challenges to statutes regulating abortion." *Planned Parenthood of Blue Ridge v. Camblos,* 155 F.3d 352, 358 (4th Cir.1998) (en banc), *cert. denied,* —— U.S. ——, 119 S.Ct. 1031, 143 L.Ed.2d 40 (1999); *accord Manning v. Hunt,* 119 F.3d 254, 268 n. 4 (4th Cir. 1997).[42] But, unlike in *Camblos* and *Manning,* that question has real pertinence here. For notwithstanding the Act's overbreadth, particularly insofar as it bans certain pre-viability procedures, there may exist some circumstances under which its restrictions would be valid. Thus, if *Salerno* supplied the standard of review, the focus would be solely upon the Act's post-viability applications, where the State's interest in potential life has "sufficient force so that the right of the woman to terminate the pregnancy can be restricted." *Casey,* 505 U.S. at 869, 112 S.Ct. 2791. The "no set of circumstances" challenge then would turn exclusively upon the constitutional import of the Act's lack of a health exception and its allegedly inade-

**41.** In addition, Chief Justice Rehnquist recognized in his *Casey* dissent that the plurality opinion disregarded the *Salerno* standard for facial challenges. *See Casey,* 505 U.S. at 972, 112 S.Ct. 2791 (Rehnquist, C.J., dissenting in part). Other individual Justices also have differed on *Casey's* impact on *Salerno* and, most recently, on the proper interpretation and scope of the *Salerno* test in the first instance. *Compare City of Chicago v. Morales,* —— U.S. ——, ——, 119 S.Ct. 1849, 1858 n. 22, 144 L.Ed.2d 67 (1999) (Opinion of Stevens, J., joined by Souter and Ginsburg, JJ.), *with Morales,* —— U.S. at ——, 119 S.Ct. at 1869–71 (Scalia, J., dissenting).

**42.** The Defendants argue that the Court is bound by a footnote in the Fourth Circuit's decision in *Manning.* The footnote observed that, because *Casey* does not expressly overrule *Salerno,* the latter should enjoy continued application in the context of facial challenges to abortion regulations. 119 F.3d at 268 n. 4. That, of course, is dicta because the parties did not request the Fourth Circuit to decide the issue and the plaintiff conceded that *Salerno* applied. *Id.* Dicta is a helpful tool to decision making, but the footnote in *Manning* does not hold sway here because the issue was conceded and thus it "was not refined by the fires of adversary presentation." *United States v. Crawley,* 837 F.2d 291, 293 (7th Cir.1988) (stating that dicta "is the part of an opinion that a later court, *even if it is an inferior court,* is free to reject") (emphasis added). Moreover, the Fourth Circuit since has declined to issue a more definite pronouncement on the *Salerno / Casey* dispute, leaving the question an unresolved one in our circuit. *See Camblos,* 155 F.3d at 359, 381, nn. 1, 14.

quate life exception, and Plaintiffs' burden of proving the *Salerno* negative would be difficult, if not impossible, in light of the quantum of information available concerning the need for, and relative safety of, the D & X. If, on the other hand, *Casey* supplies the applicable standard, then the focus would shift to Plaintiffs' central challenge—that the Act prohibits many pre-viability procedures. And, Plaintiffs. could carry their burden on that issue, for example, by proving that the Act poses a substantial obstacle to a "large fraction" of woman seeking abortions at or after eighteen weeks lmp but before viability.

Recognizing the conflict between the *Salerno* and *Casey* standards, and finding persuasive the reasoning of the overwhelming majority of those courts previously to have considered the issue, the Court concludes that *Salerno* no longer applies in the context of a facial challenge to a law on the ground that the law presents an undue burden on abortion rights stemming from *Roe* and *Casey*. As the Sixth Circuit recently explained, the touchstone of *Salerno* is at fundamental odds with the standard set forth in *Casey*:

> Under *Salerno*, no factual showing of unconstitutional applications can render a law unconstitutional if it has any constitutional applications. Under *Casey*, a factual showing of unconstitutional applications, in a substantial percentage of the cases where a law applies, can render a law unconstitutional *even if* the law has constitutional applications.

*Voinovich*, 130 F.3d at 194. Hence, as several courts of appeals have recognized, the effect of *Casey* is that the *Salerno* standard of review does not apply in cases challenging, on undue burden grounds, the facial validity of abortion statutes. *See Lawall*, 180 F.3d 1022, 1027; *Voinovich*, 130 F.3d at 195; *Bangerter*, 102 F.3d at 1116; *Miller*, 63 F.3d at 1456–58; *see also Planned Parenthood of Southeastern Pa.*, 14 F.3d at 863 n. 21.

Nor does a different test apply when the facial challenge is to a post-viability abor-tion measure. It is true that the *Casey* "undue burden" standard applies only to pre-viability abortion regulations, but the analysis in *Casey* respecting the appropriate standard for facial challenges transcended the line drawn in that case at viability for purposes of the substantive constitutional right. The Supreme Court purported to set forth a standard of general applicability, explaining that "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects." 505 U.S. at 894, 112 S.Ct. 2791. And the Court stated, without exception, that "[t]he proper focus of constitutional injury is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* Moreover, as the Sixth Circuit recognized in *Voinovich*:

> [B]ecause the Supreme Court signaled in *Casey* that an unconstitutional infringement of the liberty interests of some, but not all, pregnant women, is sufficient to justify application of a lesser standard where a pre-viability abortion is concerned, there is no reason why the Court would not similarly apply a lesser standard where a law threatens to deprive some, but not all, pregnant women of their greater constitutional interest in their own life and health.

130 F.3d at 196 (quoting district court opinion); *see also Verniero*, 41 F.Supp.2d at 499 ("*Casey* provides the governing standard for reviewing plaintiffs' facial challenge to the Act to the extent that the Act limits both pre-viability and post-viability abortions."); *James*, 984 F.Supp. at 1451–54 (holding that "a woman's profound constitutional interest in her own life and health justifies extension of the *Casey* standard to the post-viability abortion arena, because this interest is sufficiently powerful to overcome the state's interest in potential life even after the viability threshold has been crossed").

Accordingly, the *Casey* standard displaces *Salerno* in actions contesting the facial validity of abortion statutes restrict-

ing both pre- and post-viability abortions. The inquiry in this case, then, is whether "in a large fraction of the cases in which [the Act] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895, 112 S.Ct. 2791.

## B. *CASEY* ANALYSIS

### 1. The Contours of the Abortion Right

In *Roe*, the Supreme Court held that a pregnant woman has a constitutional right, under the Due Process Clause of the Fourteenth Amendment, to choose to terminate her pregnancy before viability. 410 U.S. at 152–66, 93 S.Ct. 705. In *Casey*, the Supreme Court upheld *Roe*'s "essential holding" by reaffirming "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." 505 U.S. at 846, 112 S.Ct. 2791. *Casey* also confirmed "the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health." *Id.* The Court made clear that "the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child." *Id.*

The question in *Casey* was whether a law designed to further the State's interest in fetal life, but which imposed an undue burden on the woman's decision before fetal viability, could be constitutional. *See id.* at 877. The Supreme Court held that "[t]he answer is no." *Id.* The plurality opinion contains a summary of its salient points. That summary is helpful to the assessment of the issues here presented:

● An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus obtains viability.

● To promote the State's profound interest in potential life, throughout pregnancy the State may take measures to ensure that the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion. These measures must not be an undue burden on the right.

● As with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion. Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right.

● Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.

● Subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.

*Id.* at 878–79, 112 S.Ct. 2791 (citation omitted). The plurality explained that "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877, 112 S.Ct. 2791.[43]

---

**43.** The joint opinion from which this language is quoted was subscribed to only by a three-member plurality of the Court. However, Justice Stevens specifically accepted the proposition that " '[i]f the State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother.' " *Casey*, 505 U.S. at 912, 112 S.Ct. 2791 (Stevens, J., concurring in part and dissenting in part) (quoting *Roe*, 410 U.S. at 163–64, 93 S.Ct. 705). In addition, Justice Blackmun concurred in reaffirming the "essential holding of *Roe* that

## 2. Applicability of *Roe* and *Casey* in Actions Challenging Partial Birth Abortion Legislation

Defendants contend that the foregoing principles are wholly inapplicable here, because the Supreme Court's decisions in *Roe* and *Casey* do not apply to laws restricting procedures in which fetuses are "partially born." According to Defendants, a " 'partial birth abortion' is simply *not an abortion at all* insofar as the term 'abortion' was understood by the Court in *Roe* and *Casey.*" (Defs.' Post–Tr.Br. at 49) (emphasis in original.) Instead, Defendants posit, "partial birth abortion" is more akin to infanticide because it occurs at such a late stage of fetal development.

Like their attacks on the Plaintiffs' standing, this argument fails because it suffers from a fundamental misapprehension as to the scope of the Act's definition of a "partial birth abortion." The evidence in the record establishes that the Act proscribes not only the D & X, but also many pre-viability D & E abortions. Thus, contrary to Defendants' assertions, the Court is not faced with a statute that penalizes only the performance of a later-term abortion, and even then only one in which fetal death is effectuated after delivery from the woman's body. Meanwhile, the Supreme Court has recognized that the D & E procedure, which is covered by the plain terms of the Act, represents a significant advance in second-trimester abortions.

*See City of Akron v. Akron Ctr. for Reproductive Health,* 462 U.S. 416, 435–37, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), *overruled in part on other grnds., Casey,* 505 U.S. at 882, 112 S.Ct. 2791. In light of the record, then, any argument that *Roe* and *Casey* are inapplicable in evaluating the Act is untenable.[44]

Even were the record otherwise, however, the Court would decline the Commonwealth's invitation to circumvent the requirements of *Roe* and *Casey.* Simply put, those cases established the line of demarcation for a State's ability to regulate and proscribe abortion in terms of whether the fetus was viable or nonviable, not in terms of whether a fetus was in the process of being born. *See Casey,* 505 U.S. at 870, 112 S.Ct. 2791 ("We conclude the line should be drawn at viability, so that before that time the woman has a right to choose to terminate her pregnancy."). The Defendants' argument, therefore, reduces itself to the premise that a district court can make an unprecedented distinction between a woman's right to terminate a nonviable fetus *in utero* and a nonviable fetus in the birthing canal. The only authority cited in support of this proposition are the recent decisions in physician-assisted suicide cases which the Defendants have interpreted to signal the demise of *Roe* and *Casey.*[45] Even if the Defendants correctly interpret the physician-assisted suicide decisions, it is not for this Court to upset the balance struck in *Roe* and *Casey* between

'forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health.' " *Id.* at 925 n. 2, 112 S.Ct. 2791 (Blackmun, J., concurring in part, concurring in the judgment in part and dissenting in part) (quoting *Roe,* 410 U.S. at 164, 93 S.Ct. 705). Moreover, because both Justice Stevens and Justice Blackmun went further than the plurality in deciding the relative rights of the woman and the State, the most limited basis of decision becomes the law. *See Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Hence, *Casey* supplies the law by which this action must be decided.

**44.** Defendants' contention that the Act in fact targets infanticide and not abortion also is belied by the Act itself. The General Assembly codified the Act in that part of the Virginia Code that regulates abortion, not murder. And, far from prescribing punishment commensurate with infanticide, the General Assembly instead chose to expose physicians who violate the Act to only a maximum term of imprisonment of one year. *See* Va.Code Ann. 18.2–74.2(A).

**45.** *See, e.g., Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Vacco v. Quill,* 521 U.S. 793, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997).

two very important sets of competing rights and interests.

Other courts have rejected similar entreaties to delineate a judicial category for a fetus in the process of being born. *See, e.g., Causeway Medical Suite v. Foster*, 43 F.Supp.2d 604, 615 (E.D.La.1999); *Carhart v. Stenberg*, 11 F.Supp.2d 1099, 1132 n. 48 (D.Neb.1998) (incorporating *Carhart v. Stenberg*, 972 F.Supp. 507, 529 (D.Neb. 1997)); *Planned Parenthood of Southern Arizona v. Woods*, 982 F.Supp. 1369, 1377 (D.Ariz.1997). These several decisions are clearly right, and no precedent exists to the contrary. Therefore, *Roe* and *Casey* supply the informing rule in assessing whether the Act runs afoul of the fundamental right to choose to have an abortion.[46]

### 3. The Act's Pre-viability Application as an "Undue Burden"

At the heart of *Casey*'s undue burden standard, the parameters of which are set forth above, is a determination that the State may not rely on its interest in the potential life of the fetus to place a substantial obstacle to abortion before viability. Rather, to recapitulate, the Supreme Court held that the State's dual interests in fetal life and maternal health permit only two broad categories of regulations before fetal viability. First, "[t]o promote the State's profound interest in potential life, throughout pregnancy the State may take measures to ensure that the woman's choice is informed, and *measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion.*" 505 U.S. at 878, 112 S.Ct. 2791 (emphasis added). Second, "[a]s with any medical procedure," the Supreme Court

explained that "the State may enact regulations to further the health or safety of a woman seeking an abortion." *Id.* But, this second category of permissible regulation also has its limits because "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Id.*

In *Planned Parenthood of Wisconsin v. Doyle*, 162 F.3d 463 (7th Cir.1998), the Seventh Circuit elaborated upon the types of pre-viability abortion regulations that remain permissible in *Casey*'s wake. Writing for the court, Chief Judge Posner explained that:

> [The State] may adopt measures that, while not preventing the pregnant woman from deciding whether to have an abortion, remind her of the gravity of the choice and the value of fetal life.... And it may adopt paternalistic measures for the protection of the mother's health, as by requiring that only physicians be allowed to perform abortions. *Mazurek v. Armstrong*, 520 U.S. 968, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam).

*Doyle*, 162 F.3d at 467. The Seventh Circuit, in *Doyle*, concluded that Wisconsin's partial birth abortion ban did not fall into either category. Because the statute contained no exception for cases before viability, the Seventh Circuit held that the statute unconstitutionally burdened the abortion right and ordered the district court to preliminarily enjoin its enforcement. *See id.*

Like the Wisconsin statute in *Doyle*, Virginia's partial birth abortion ban applies without regard to whether the abortion is sought after the fetus has reached viability or earlier. But, *Doyle* analyzed

---

**46.** In other partial birth abortion litigation, some plaintiffs also have suggested that *Casey* does not supply the governing rule. But, rather than seeking a more forgiving standard, those plaintiffs argued that the "strict scrutiny" standard should apply rather than the principles enunciated in *Casey* because *Casey* did not involve a statute banning a

particular abortion method. *See, e.g., Jegley*, No. LR–C–97–581, slip op. at 44; *cf. Jane L. v. Bangerter*, 102 F.3d 1112, 1116 n. 4 (10th Cir.1996). There is no warrant to consider this argument further because the Plaintiffs here have not contended that some standard other than that in *Casey* provides the applicable law.

Wisconsin's statute without the benefit of a fully developed record, and, consequently, the Seventh Circuit's inquiry was premised on a statute that reached only the D & X, albeit in vague terms. Thus, although *Doyle* is useful insofar as it frames the inquiry in terms of the sort of measures that are permissible in the context of a pre-viability abortion regulation, the analysis here must take into account the record which establishes that the practical effect of Virginia's Act is even broader in scope. Specifically, the Act's definition of "partial birth abortion" includes not just the D & X but also the most common method of second-trimester abortion, the D & E, particularly those D & Es performed starting at around eighteen weeks lmp. *See supra* Part II.B.2.b. Not surprisingly, then, Virginia's law stands on even shakier constitutional footing than that supporting the Wisconsin law before the Seventh Circuit in *Doyle*.[47]

First, the Act cannot be justified as a legitimate effort on behalf of the Commonwealth to promote the State's "profound interest in potential life." *Casey*, 505 U.S. at 878, 112 S.Ct. 2791. That is because, as stated previously, *Casey* made clear that all pre-viability measures designed to advance this interest must have as their purpose to persuade the woman to choose childbirth over abortion. *See id.; see also id.* at 877, 112 S.Ct. 2791 ("[T]he means chosen by the State to further the interest in potential life must be calculated to inform the woman's choice, not hinder it."). Thus, in *Casey*, the Supreme Court upheld a 24–hour waiting period requirement, the intention of which was to encourage the

woman to rethink her decision to have an abortion. But, unlike that provision, the Act does not seek to make women more informed. Rather, its clear and undisputed purpose is simply to narrow the universe of previously allowable pre-viability abortions. The degree to which the Act succeeds, and whether it in fact goes too far, are both hotly debated and of much significance, but there has been no suggestion in this litigation that the Act is some sort of informational or educational measure. Here, as in *Doyle*, the Act simply cannot be defended by reference to this rationale. 162 F.3d at 467.

Perhaps in recognition of this shortfall, the Defendants instead characterize the Act as "designed to protect women's health from the dangers of the partial birth abortion procedure." (Defs.' Post–Tr.Br. at 43.) As has been the case with so many of their other arguments, however, Defendants premise their efforts to frame the Act as a reasonable health regulation on the erroneous belief that the Act prohibits only the D & X procedure. In fact, the Court has found already that the Act has the effect of criminalizing the D & E procedure, particularly when performed at gestational ages of eighteen weeks lmp and later. What is more, the Act does so without any exception for when that procedure, either before or after viability, is necessary for the preservation of the woman's health. It is pursuant to this interpretation that the Court now evaluates the Defendants' contention that the Act's proscriptive provisions "further the health or safety of a woman seeking an abortion,"

---

47. *Doyle* reversed the district court's decision and ordered the lower court to grant a preliminary injunction against the enforcement of the Wisconsin partial birth abortion statute. 162 F.3d at 471. On remand, after a full trial on the merits, the district court again upheld the challenged statute. *See Planned Parenthood of Wisconsin v. Doyle*, 44 F.Supp.2d 975 (W.D.Wis. 1999) (*"Doyle II"*). To the extent *Doyle II* is premised on a different statute (the focus of the Wisconsin law was a "living child," not a "living fetus or a substantial portion thereof"), its analysis is

simply inapplicable here. *Doyle II* is also distinguishable because that case involved a different factual record. For example, Dr. Giles testified in *Doyle II*, but he apparently did not exhibit the same lack of credibility there that rendered his testimony unreliable and suspect here. *See Doyle*, 44 F.Supp.2d at 981.

These two differences aside, this Court respectfully disagrees with *Doyle II* insofar as the conclusions set forth herein are irreconcilable with those reached in that case.

*Casey*, 505 U.S. at 878, 112 S.Ct. 2791, and do not amount to an undue burden on the right.

The Pennsylvania statute at issue in *Casey* did not purport to ban a particular abortion method nor did it have that effect. In the absence of other guidance, many of the federal courts tasked with considering state partial birth abortion legislation (supposedly justified by similar interests in maternal health) have turned to a pre-*Casey* decision, *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), for direction. *See, e.g., Voinovich*, 130 F.3d at 200–01; *Verniero*, 41 F.Supp.2d at 500–01; *Jegley*, No. LR–C–97–581, slip op. at 44–45; *Hope Clinic*, 995 F.Supp. at 859; *Evans*, 977 F.Supp. at 1315–18. As these courts all have recognized, *Danforth* provides a useful analog when assessing legislation that bans a particular abortion procedure because the Supreme Court's reasoning in that case "foreshadows and substantially tracks" the *Casey* undue burden analysis. *Evans*, 977 F.Supp. at 1316.

In *Danforth*, the Supreme Court considered a provision of a Missouri abortion statute which prohibited the use of saline amniocentesis, an abortion procedure used at that time in seventy percent of all abortions performed after the first trimester of pregnancy. The appellants argued that the proscription would ban virtually all abortions after the first trimester because the only other available methods, hysterotomy and hysterectomy, were significantly more dangerous, and because prostaglandin instillation, another method, was not widely used. 428 U.S. at 75–79, 96 S.Ct. 2831. The Supreme Court held that the provision was unconstitutional, stating:

> The State . . . would prohibit the use of a method which the record shows is the one most commonly used nationally by physicians after the first trimester and which is safer, with respect to maternal mortality, than even continuation of the pregnancy until normal childbirth.

Moreover, as a practical matter, it forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed.

*Id.* at 78–79, 96 S.Ct. 2831. The Court concluded that the ban was not a reasonable regulation for the protection of maternal health, and instead, that it constituted an unreasonable or arbitrary regulation designed to inhibit the vast majority of abortions performed after the first trimester of pregnancy. *Id.*

In the parlance of *Casey*, the Supreme Court in *Danforth* held that a statute that bans a common abortion procedure, but leaves in place riskier alternatives, constitutes an undue burden by placing a substantial obstacle in the path of a woman seeking a pre-viability abortion. The question in this case, then, is whether the Act's prohibition of later-term D & Es has the same or similar effect. And, as *Danforth* instructs, that question is to be answered by inquiring whether there are safe and available alternatives to the D & E after eighteen weeks lmp because, only then, would the Act qualify as a "regulation[ ] to further the health or safety of a woman seeking an abortion." *Casey*, 505 U.S at 878, 112 S.Ct. 2791. And, only then, would the Act's prohibition result in no undue burden.

When approached in this fashion it becomes readily apparent that the Act cannot stand. The record demonstrates that the Act imposes restrictions on D & E abortions at a gestational age when the only two common methods of procuring abortion are the D & E and induction. (The alternative methods of hysterotomy and hysterectomy are extremely rare and significantly more dangerous than either induction or D & E. (Tr. at 128–29; AMA Report at 10.)) Approximately 86% of the reported abortions performed in the United States between 16 and 20 weeks lmp are effected through the D & E procedure, while only 8.8% of abortions are by the

labor induction method during the same period. (AMA Report at 7.) The statistics are similar for twenty-one weeks lmp and beyond: 86.4% of abortions are D & Es, while labor induction methods constitute only 9.1% of the reported procedures. (*Id.*) These statistics are consistent with the testimony received at trial, which indicated that the D & E method is the more common method, at least up to twenty weeks lmp. (P.I.Tr. at 42; Tr. at 405.)

In addition, many physicians prefer D & E over labor induction because D & E is less expensive, takes less time, and can be done on an outpatient basis. (AMA Report at 11.) Some physicians prefer the D & E because, in their opinion, the procedure takes a lesser psychological toll on women than induction because the D & E does not imitate labor. (*Id.*) Still others, like Dr. Fitzhugh, do not induce labor because of what they perceive as unnecessary resultant physiological stress. Dr. Fitzhugh testified that he eschews induction because it is a "very morbid procedure[ ]." (Tr. at 70; *see* Tr. at 104.)

The Act, therefore, reaches the more common and preferable method for late-term abortion, the D & E, particularly when the case involves a pregnancy between 18 and 20 weeks lmp. *Compare Danforth,* 428 U.S. at 77, 96 S.Ct. 2831.[48] Assuming induction abortions, though uncommon, are also available in the Commonwealth at this gestational age (on this point the Defendants have offered no evidence) the question then becomes whether

the Act, by forcing women at eighteen weeks lmp and beyond to choose either abortion by induction or no abortion at all, requires women to undergo a procedure more dangerous than the D & E in order to exercise their constitutional rights. *See Danforth,* 428 U.S. at 78–79, 96 S.Ct. 2831; *Verniero,* 41 F.Supp.2d at 501; *Evans,* 977 F.Supp. at 1317–18; *cf. Casey,* 505 U.S. at 878, 112 S.Ct. 2791 ("Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right.").

The overwhelming evidence before the Court is that the Act has precisely that effect. As a general proposition, maternal mortality rates are higher for labor induction than for D & E procedures (7.1 and 3.7 per 100,000 abortions, respectively). The difference between these rates shrinks as pregnancy progresses, but the rates remain disparate up to twenty weeks lmp. (AMA Report at 10.)[49] Meanwhile, the record evidence is that mortality from childbirth occurs at a greater incidence than does mortality from D & Es performed before twenty weeks lmp. (Pls.' Ex. 4A at 52.) The Act therefore denies Virginia women seeking a late-term (but pre-viability) abortion access to a safe procedure, and instead requires them to undergo a statistically more risky procedure in those cases in which the statute is implicated. *Danforth,* read in perspective of *Casey,* teaches that this amounts to an undue burden.

---

**48.** It is true that, quantitatively speaking, the Act has a less severe overall impact on abortion practice than the statute considered in *Danforth.* The *Danforth* statute banned a common procedure used throughout the second trimester, whereas the record in this case is that the Act's prohibitive sweep only comes into play when the D & E is performed at around 18 weeks lmp. By that point in gestation, physicians nationwide perform relatively fewer abortions overall, D & E or otherwise—the record reflects that 95% of all elective abortions are done by 15 weeks lmp. (AMA Report at 5 .) This, however, is a distinction without a difference. As stated previously, "[t]he proper focus of constitutional inquiry is

the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey,* 505 U.S. at 894, 112 S.Ct. 2791. In this case, the Act is a restriction for those women seeking to exercise their right to choose upon reaching 18 weeks lmp. The restriction on that fraction, then, is the "proper focus of constitutional inquiry."

**49.** Complication rates also reflect a significantly higher number of complications associated with induction procedures than with D & E procedures, but these latter figures are relatively outdated. (*Id.* at 10.)

Even more significant is the Act's effect on those women for whom induction of labor is contraindicated.[50] There was overwhelming evidence at trial that the compounds used in induction procedures pose health risks to some women with certain medical conditions. (Tr. at 155; Hausknecht Decl. ¶ 26; Jones Decl. ¶ 18.) Dr. Stubblefield explained, for example, that prostaglandin or saline instillation is not safely performed on patients with cardiovascular disease. (Pls.' Ex. 4A at 67.) Conditions such as a hysterotomy scar on the uterus or marked obesity likewise render the induction method of abortion significantly less safe than the D & E. (Tr. at 155–56.) Moreover, induction methods may be contraindicated for some women who should not go through labor for other reasons, such as a woman whose fetus is lying crosswise in the uterus; who has an active pelvic infection; who is severely retarded and does not understand labor; or who cannot emotionally or physically handle the strain. (Jones Decl. ¶ 18.) And still other times, Dr. Stubblefield explained, it simply is more advantageous to the woman's health to choose the D & E method over induction because the particular patient needs the abortion procedure to be of short duration. (Pls.' Ex. 4A at 67.) The Act denies physicians and their patients this option.

By proscribing the D & E method of abortion once a pregnancy reaches eighteen weeks lmp, the Act in effect relegates women who cannot, or should not, have an induction to abortion by either hysterectomy or hysterotomy. Any statute with such an effect cannot rationally be related to an interest in maternal health, and Virginia's Act is no exception.[51] By forcing women for whom induction is contraindicated to choose one of these more dangerous procedures or no abortion at all, the Act constitutes an impermissible "trade-off" between women's health and fetal survival. *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 768–69, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), *overruled on other grnds.*, *Casey*, 505 U.S. at 882–83, 112 S.Ct. 2791. It is settled that, when state legislation demands such a "trade-off" before fetal viability, it places a "substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey*, 505 U.S. at 878, 112 S.Ct. 2791; *see Danforth*, 428 U.S. at 77–79, 96 S.Ct. 2831.

Other courts examining similar legislative acts also have determined that the inclusion of the D & E method of abortion within the statute's proscriptive reach amounts to an undue burden under *Casey*. *See, e.g., Voinovich*, 130 F.3d at 200–01; *Miller*, 30 F.Supp.2d at 1157; *Verniero*, 41 F.Supp.2d at 501; *Jegley*, No. LR–C–97–581, slip op. at 44–45; *Eubanks*, 28 F.Supp.2d at 1036–37; *Carhart*, 11 F.Supp.2d at 1129; *Hope Clinic*, 995 F.Supp. at 859; *Woods*, 982 F.Supp. at 1377–79; *Evans*, 977 F.Supp. at 1315–18. Thus, in *Voinovich*, the Sixth Circuit held that the statute there at issue covered the D & E procedure in addition to the D & X. "As in *Danforth*," the court concluded, "the Act bans the most commonly used second trimester procedure and therefore is an unconstitutional burden on a woman's right to choose to have an abortion." 130 F.3d at 201. Similarly, in *Evans*, the district court concluded that the Michigan's partial birth abortion ban unconstitutionally encompassed the D & E procedure:

---

**50.** Focusing the constitutional inquiry on these women, though they may constitute a minority of those affected by the Act, is entirely appropriate under the standard of review by which this action is to be decided. *Cf. Casey*, 505 U.S. at 894, 112 S.Ct. 2791 ("The analysis does not end with the one percent of women upon whom the statute operates; it begins there.").

**51.** The overall mortality rate associated with hysterectomy or hysterotomy is 51.6 per 100,000 abortions, as opposed to the 3.7 rate that denotes the D & E or the 7.1 rate attendant to induction. (AMA Report at 10.) Between 16 and 20 weeks lmp—the gestational period that the Act impacts most severely—the mortality rate for hysterectomy and hysterotomy doubles to 103.4 per 100,000 abortions. (*Id.*)

"[t]o leave women with only far riskier alternatives to the D & E clearly imposes an undue burden on a woman's right to seek a pre-viability abortion." 977 F.Supp. at 1318. These decisions bolster the conclusion reach here.[52]

Defendants seek to avoid the conclusion that Act imposes an undue burden by arguing that the Act's legislative history, as well as the legislative history of the federal legislation on which it was modeled, both demonstrate that the General Assembly's intent was not to make criminal the D & E procedure. Defendants correctly assert that, under *Casey*, the legislative intent behind the enactment is a pertinent inquiry: "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877, 112 S.Ct. 2791. The *Casey* standard, however, is framed in the disjunctive; a statute is unconstitutional if it has *either* the purpose or effect of imposing an undue burden. Having concluded that the Act has such an

effect, further inquiry into legislative purpose in this case is simply irrelevant, unnecessary, and ill-advised. *Accord Carhart*, 11 F.Supp.2d at 1130 ("The problem, of course, with this argument is that the words of the statute, regardless of the legislature's intent, make the performance of the D & E a crime.").

In any event, a review of the federal and state legislative history does not provide definitive guidance on the issue one way or the other. Although it is true that the federal Partial Birth Abortion Ban Act of 1997, H.R.1122, 105th Cong. (1997), upon which the Virginia Act is based, included language of scienter and gained the endorsement of the AMA's Board of Trustees, *see supra* Part I .B, these features alone do not cloak that proposed legislation (and Virginia's Act, by extension) with immunity from constitutional challenge.[53] And, the scant legislative history available for Va.Code Ann. § 18.2–74.2 is, at best, ambiguous as to whether the purpose of the statute was to proscribe only the D & X and not to otherwise effect D & E abortion practice.[54] In sum, nothing in the

---

**52.** The Court makes the additional observation that, even were the record otherwise, a statute that proscribed only the D & X procedure still would be in constitutional trouble for most of the same reasons. There simply is no valid State interest that would justify the immeasurable risk posed to women's health. *See Doyle*, 162 F.3d at 466–67.

**53.** As for the mens rea language, the record presently before the Court establishes that this additional phraseology adds verbiage but does not have the effect of exempting the D & E procedure. If anything, the emphasis placed on the "deliberately and intentionally" language by the Defendants in this case, and those in Congress before them, reveals nothing about the purpose of the federal legislation other than a misunderstanding on behalf of its supporters regarding abortion practice. And, as for the highly-touted AMA Board of Trustees endorsement, many have offered alternative explanations for the AMA's last-minute decision to support the federal bill, some less than pure. *See* Ann MacLean Massie, *So–Called "Partial–Birth Abortion" Bans: Bad Medicine? Maybe. Bad Law? Definitely!*, 59 U.Pitt.L.Rev. 301, 303 n. 5 (1998) (citing Jonathon Gardner, *Was AMA's Abortion Stand a*

*Quid Pro Quo?*, Mod. Healthcare, May 26, 1997, at 3; Judith Havemann, *AMA Adversaries Question Timing of Abortion Ban Stance, Legislative Requests*, Wash. Post, May 30, 1997, at A7). It should go without saying that constitutional adjudication must rest on something more than speculation concerning the decision of a special interest group to support one version of a bill over another.

**54.** It is undisputed that the General Assembly intentionally painted with a broad brush. The Defendants contend that this was out of an effort to prohibit "the D & X and its potential variants," but there are some indications that the legislators set their sights even higher. For example, the General Assembly specifically rejected a proposed amendment to HB1154 that would have replaced the statutory definition of "partial birth abortion," now codified at Va.Code Ann. § 18.2–74.2(D), with a more narrow definition that tracked the ACOG policy statement. Delegate McDonnell, one of the chief patrons of the Act, contended that the amendment would essentially gut the statute because the ACOG definition presupposes an "intact" fetus and "[i]f any other part of the fetus came out that

federal or state legislative record alters the conclusion reached herein upon consideration of the words of the Act against the record evidence: that the Act has the effect of imposing an undue burden on the abortion right as defined by the Supreme Court.

### 4. Lack of Health Exception/Inadequate Life Exception

■ The undue burden standard applies only to pre-viability abortion regulations. *See Casey*, 505 U.S. at 877, 112 S.Ct. 2791; *Voinovich*, 130 F.3d at 201. However, the inquiry into the Act's constitutionality does not end with the determination that it imposes an undue burden on the abortion right before viability. That is because *Casey* explicitly reaffirmed *Roe's* approach to post-viability abortion regulations:

> We also reaffirm *Roe's* holding that "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion *except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.*"

*Casey*, 505 U.S. at 879, 112 S.Ct. 2791 (quoting *Roe*, 410 U.S. at 164–65, 93 S.Ct. 705) (emphasis added). After *Casey*, it therefore remains a bedrock principle of abortion jurisprudence that, at all stages

of gestation, the woman's health must be the physician's "paramount consideration." *Thornburgh*, 476 U.S. at 769, 106 S.Ct. 2169; *see Colautti v. Franklin*, 439 U.S. 379, 400, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); *Doyle*, 162 F.3d at 469; *Voinovich*, 130 F.3d at 203; *Jane L. v. Bangerter*, 61 F.3d 1493, 1504 (10th Cir.1995), *rev'd on other grnds. sub nom. Leavitt v. Jane L.*, 518 U.S. 137, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996).

The Act simply ignores this rule by making it unlawful for a physician to "knowingly perform a partial birth abortion that is not necessary to save the life of a mother." Va.Code Ann. § 18.2–74 .2(A). As explained above, the Act's definition of "partial birth abortion" encompasses many D & E procedures; and, the Act clearly does not provide for an exception when the prohibited procedure (D & E or otherwise) is necessary, in appropriate medical judgment, for the preservation of the mother's health. The present question, then, is related to, yet distinct from, that which is presented in the context of the Act's pre-viability applications: does the Act's ban on a method of abortion without a maternal health exception foreclose what might be the safest treatment alternative and thereby have the impermissible effect of endangering further those women for whom a post-viability abortion is necessary to preserve their health?[55]

was not intact, the definition would not apply." (HB1154 House Tr. at 12 (Feb. 17, 1998).) Ultimately, the legislators agreed with Mr. McDonnell and defeated this proposal, but not until after opponents of the Bill in the House admonished the delegates to "go at this with a rifle and not a shotgun." (*Id.* at 15 (Rep.Cranwell).)

Meanwhile, proponents of the Act in the Senate rejected a floor amendment that would have had a similarly narrowing effect. Proposed by Sen. Edwards, the amendment would have limited the Act to post-viability procedures "not necessary to prevent substantial and irremediable impairment to the mental or physical health of the woman." (HB1154 Senate Tr. at 3–4 (Mar. 11, 1998).) Senator Edwards explained that his amendment was "designed to make this Bill consti-

tutional," (*id.* at 4), but the Senate rejected the proposal.

These excerpts are in a sense indicative of legislation passed with a constitutionally impermissible purpose, but the record is too slim for a reasoned decision on that question. *Compare Jane L. v. Bangerter*, 102 F.3d 1112, 1116–17 (10th Cir.1996) (finding that Utah's legislature acted with an impermissible intent in passing statute that barred most abortions after 20 weeks gestational age, as demonstrated by the legislature's establishment of an abortion litigation trust account). In any event, any such conclusion would be unnecessary in light of the finding that the Act has an unconstitutional effect.

**55.** In assessing the Act's pre-viability applications, the lack of a health exception was but

The proper starting point is to set the acceptable parameters for an abortion statute's post-viability health exception. In *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), decided the same day as *Roe*, the Supreme Court made clear that whether an abortion is necessary is a professional medical judgment to be "exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment." *Id.* at 192, 93 S.Ct. 739.[56] The Supreme Court since has emphasized that States must treat both maternal health and physician discretion with paramount importance throughout gestation. *See Casey*, 505 U.S. at 879–80, 112 S.Ct. 2791; *Thornburgh*, 476 U.S. at 768–69, 106 S.Ct. 2169; *Colautti*, 439 U.S. at 400, 99 S.Ct. 675; *Danforth*, 428 U.S. at 78–79, 96 S.Ct. 2831. And, subsequent Supreme Court decisions have instructed that the factors listed in *Doe* should guide the determination whether an abortion regulation's post-viability "health exception" is constitutional. *See Colautti*, 439 U.S. at 400, 99 S.Ct. 675; *Beal v. Doe*, 432 U.S. 438, 441 n. 3, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977).

In the years since *Roe* and *Doe*, the lower federal courts have followed the Supreme Court's lead, turning to the considerations enumerated in *Doe* to assess the validity of an abortion regulation's "health exception." *See, e.g., Voinovich*, 130 F.3d at 209 (holding that a post-viability health exception must encompass physical health concerns as well as "severe irreversible risks of mental and emotional harm"; relying on *Doe*); *A Woman's Choice—East Side Women's Clinic v. Newman*, 904 F.Supp. 1434, 1466–74 (S.D.Ind.1995) (finding that plaintiffs had reasonable likelihood of prevailing on merits of their claim that abortion regulation's medical emergency exception was unconstitutionally narrow, in part because the statute's reference to "major bodily function" appeared to exclude considerations listed in *Doe*); *see also Verniero*, 41 F.Supp.2d at 501–02 (relying on *Doe* in determination that New Jersey's partial birth abortion ban was unconstitutional because it did not include a health exception). It is against those same considerations that the effect of the Act, which lacks a health exception altogether, must be considered.

The record evidence reflects several medical conditions, some caused by pregnancy and some by pre-existing conditions which then complicate pregnancy, that may necessitate an abortion to protect the mother's health. These include, but are not limited to, the following: heart disease, which may pre-exist pregnancy but not pose a serious threat until 26–28 weeks lmp, when the increased cardiovascular load can cause congestive heart failure; anemia and other diseases of the blood;

one factor in the determination that the Act imposed an undue burden on the abortion right. Admittedly, this omission played a significant role, for it evidenced an unconstitutional "trade off" between the woman's interests and fetal survival. But, the conclusion that the Act imposed an undue burden on the right to seek an abortion before viability was supported by other considerations as well. *See supra* Part III.B.3. In this part of the analysis, by contrast, the focus is solely upon the Act's effect on post-viability abortion practice. Consequently, the inquiry is more confined for, as stated above, the State's profound interest in fetal life entitles it to proscribe abortion altogether at this gestational age—so long as exceptions exist for pregnancies that "endanger the woman's life *or*

*health." Casey*, 505 U.S. at 846, 112 S.Ct. 2791 (emphasis added).

**56.** *Doe* involved a challenge to the constitutionality of a Georgia statute that made it a crime for a physician to perform an abortion except when it was "based upon his best clinical judgment that an abortion is necessary." *Id.* at 202, 93 S.Ct. 739. The plaintiffs argued that the word "necessary" was unconstitutionally vague, but the Supreme Court interpreted the statute in a manner that permitted the Court to reject the plaintiffs' challenge. *See id.* at 191–92, 93 S.Ct. 739 (citing *United States v. Vuitch*, 402 U.S. 62, 71–72, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971)).

urinary tract infections and disease, including acute pyelonephritis, which is one of the most frequent medical complications of pregnancy and which on occasion can lead to bacterial shock, producing serious health consequences and in some cases death; acute renal failure; endocrine disorders, such as diabetes, which can either pre-exist pregnancy or be caused by pregnancy, and which often produce seriously adverse affects on the woman; or diseases of the nervous system, including epilepsy, which is a condition that may be exacerbated by pregnancy, resulting in an increase in frequency of seizures. (P.I.Tr. at 81–82; deProsse Decl. ¶ 21.) Dr. Fitzhugh has experienced many of these health conditions first-hand, having performed abortions on women whose pregnancies threatened their health because they were accompanied by medical complications such as severe diabetes, chronic renal disease, severe heart disease, cancer, or other health conditions. (Fitzhugh Decl. ¶ 27.)

About the sorts of mental health conditions that might necessitate an abortion, Dr. Fitzhugh testified that he personally has performed abortions when a psychiatrist indicated that the mother's manic-depressive condition would worsen by continuing the pregnancy. (Tr. at 104.) Dr. Fitzhugh also opined that pregnancies resulting from rape or incest pose severe threats to the mother's mental health. (Tr. at 105.) Other examples before the Court include tragic cases of women who come late for prenatal care, only to find that they are HIV-positive. Having just learned that they have a potentially fatal disease, the physician may be required to advise the woman to consider abortion instead of coping with the delivery of a baby also infected with the virus. (deProsse Decl. ¶ 21.) [57]

Admittedly, the pregnant woman often will be able to address any threatening health issue in the first two trimesters of her pregnancy, before the fetus reaches viability, and there may be no reason at all, other than lack of diligence or neglect, that the pregnant women suddenly finds herself carrying a viable fetus that jeopardizes her health and that necessitates consideration of an abortion. But, whether in those cases the woman's health must take a backseat to the State's interest in fetal life—i.e., whether a "waiver" of some sort may be implied from the woman's delay—need not be decided here because the number of post-viability abortions are too few and the data respecting them too sparse from which to draw any reasoned conclusion regarding the frequency with which a post-viability abortion is sought out of sheer neglect. [58]

57. The district court in *Verniero*, a case assessing the constitutionality of New Jersey's partial birth abortion ban, made similar findings as to the sorts of severe health risks facing some pregnant women:

A woman's health may be severely compromised by carrying a pregnancy to term. Certain physical and mental health conditions are aggravated by or progress during pregnancy. Physiological stress on the body increases during pregnancy and may exacerbate physical conditions such as certain neurological and immunological diseases, liver or kidney disease, severe hypertension, cardiac conditions, and diabetes. For example, for a woman who suffers from a severe cardiac condition, the coincidence of heart failure and labor means a fifty percent chance of dying. A woman who suffers from severe eye disease, relating to a preexisting condition of diabetes, may, because laser therapy is inconsistent with pregnancy, incur blindness if required to carry to term. Mental conditions, such as schizophrenia, may also worsen as a result of a pregnancy, putting the woman at greater risk for self-harm. In any of these cases, it may be in the woman's best health interest to consider an abortion.

41 F.Supp.2d at 502. The record here does not appear to be materially different than that before the court in *Verniero*.

58. Of course, the validity of any such "waiver" argument is unlikely given the repeated Supreme Court admonishments regarding the overriding importance of the woman's health. *See, e.g., Thornburgh*, 476 U.S. at 769, 106 S.Ct. 2169; *Colautti*, 439 U.S. at 394, 400, 99 S.Ct. 675; *Doyle*, 162 F.3d at 469; *Voinovich*, 130 F.3d at 203; *Jane L.*, 61 F.3d at 1504, *rev'd on other grnds. sub nom. Leavitt v. Jane*

What little is known about the reasons for such delay comes from a 1987 survey conducted by the Alan Guttmacher Institute (AGI). Data from that survey indicated that most women seeking abortions after the first trimester did so because they did not realize they were pregnant, because they misjudged gestation, or because they reportedly had difficulty making arrangements for an abortion, particularly raising enough money for the procedure. (AMA Report at 6.) The AGI survey also found that women having a later abortion were more likely to cite personal health problems, possible fetal health problems, or rape or incest having caused the pregnancy. (*Id.*) This survey data was corroborated by evidence from Drs. deProsse and Hausknecht, both of whom explained and gave examples of cases in which medical complications did not make themselves known or present major health risks until late in the pregnancy. (P.I.Tr. at 80–82; deProsse Decl. ¶ 21.)

The record therefore establishes that not all abortions are purely elective, but rather that health conditions can and do arise that necessitate the performance of an abortion. The health condition may not make itself known until the fetus has attained viability. On occasion the danger attendant to a particular pregnancy may be present from the onset, but for any number of reasons, many of them outside of the woman's control, an abortion is not sought until viability.

That the D & E method is among those procedures used to accomplish the rare post-viability abortion is evident from the Defendants' own Exhibit P, the AMA Report. The AMA Report states that "[s]ome of the medical procedures used to induce abortion prior to viability are the same or very similar to procedures used in post-viability abortions, and therefore there is no clear distinction between some later-term pregnancy techniques and those which are used earlier to end the pregnancy." (AMA Report exec. summary.) The

AMA Report further estimates that eighty-six percent of all abortions performed past twenty weeks of gestation are performed by D & E. (*Id.* at 6.) Meanwhile, D & E remains the preferred method (or in some cases the only method) available to women for whom induction is contraindicated and for whom the non-vaginal delivery options of hysterectomy or hysterotomy pose too great a risk.

On balance, then, there is ample evidence in this case that the D & E procedure proscribed by the Act is used to effectuate post-viability abortions; that a post-viability abortion may be necessary to preserve the health of a woman; and that, in some instances, the D & E procedure is the safest method available to a woman in need of a post-viability abortion. By virtue of its overly broad language and its lack of a "health exception," the Act denies this option to physicians and their patients. That is a result which the Due Process Clause of the Fourteenth Amendment, as interpreted by *Roe* and reaffirmed in *Casey,* clearly forbids.

Nor would the conclusion change were the Court to adopt the Defendants' considerably more narrow interpretation of the Act, which the Court already has rejected *supra* in Part II.B, and construe the Act as proscribing only the D & X and "potential variants thereof," whatever that may mean. Defendants argue that no health exception then would be needed, because the D & X method of abortion is a "rogue procedure" and is "never medically necessary ." Defendants make several related points in support of their position, arguing that the D & X is not taught at medical schools; that it is not in the medical literature; that it is not within the standard of care; and that it is not part of informed consent. Nor is the D & X necessary, Defendants contend, in cases in which it is desirable to obtain an intact fetus for genetic testing. (Defs.' Post–Tr.Br. at 31–35, 41–42.)

*L.,* 518 U.S. 137, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996).

Many of these arguments are based on unassailable facts. However, those facts are by no means persuasive reasons to reach a different conclusion respecting the constitutionality of the Act, even assuming that it proscribes only the D & X. The absence of the D & X from peer-reviewed studies, medical school classrooms, and informed consent is not particularly suspect. Dr. deProsse's testimony described similar circumstances surrounding the suction curettage, saline amnioinfusion,[59] and D & E methods of abortion when those procedures first became widely known in the medical community. (Tr. at 122–27.) Just as those procedures once were, so too is the D & X a new, novel, and controversial method of abortion. Moreover, it would make little sense for medical schools to teach the D & X now, when such an educational process might necessitate the commission by teacher or student of what many states, like Virginia, have defined as a criminal act.[60]

On the medical necessity of the D & X, Defendants correctly posit that there always is available an alternative form of abortion. But, as Chief Judge Posner observed in *Doyle*, "the alternative may not always be the best from the standpoint of the mother's health." 162 F.3d at 467. For example, the induction method of abortion may be contraindicated for some women, as already explained. And, the risks attendant to hysterectomy and hysterotomy are ever present. They need not be repeated here.

When the relative safety of the D & E is compared to the D & X, there is evidence that the D & X (which is but a type of D &

E, *see supra* n. 21) has many advantages from a safety perspective. In a D & E in which the physician disarticulates the fetus, sharp instruments and sharp fetal fragments may damage the woman's uterus. A D & X could reduce those risks. A D & X may also result in less blood loss and less trauma for some patients and may take less operating time, thus reducing anesthesia needs. (Tr. at 153–55; Pls.' Ex. 4A at 55–58, 65; P.I.Tr. at 80; deProsse Decl. ¶ 29.) For some women, then, the D & X may be the safest procedure. This is also the opinion of the ACOG. (Pls.' Ex. 2.) Even the AMA Board of Trustees, which lent its last-minute support to the 1997 federal legislation, has to this day not retracted this statement appearing in the AMA Report: "The AMA recommends that the [D & X] not be used unless alternative procedures pose materially greater risk to the woman. The physician must, however, retain the discretion to make that judgment, acting within standards of good medical practice and in the best interest of the patient." (AMA Report at 15.)[61]

In short, the D & X is new and has not yet been studied systematically. In any given case, there may always be an alternative method of abortion. But, the evidence before the Court is that, in some pregnancies, there may be no alternative procedure that would protect the health of the mother as effectively as would the D & X procedure. Virginia law, meanwhile, already prohibits performing an abortion in the third trimester (which roughly coincides with viability) unless several conditions are met, including a certification

---

59. Saline amnioinfusion is the abortion procedure accomplished by instillation of saline into the amniotic sac. (Tr. at 124.)

60. At least twenty-one states have enacted partial birth abortion legislation, and at least fifteen others have considered doing so. *See* Elizabeth A. Cooke, *South Carolina Bans Partial–Birth Abortions*, 49 S.C.L.Rev. 1041, 1043–44 & nn. 12–13 (1998) (collecting citations; more have been enacted since publication).

61. Even the Defendants' own witness, Dr. Bowes, gave deposition testimony that the D & X procedure has plausible theoretical advantages over other abortion methods. (Defs.' Ex. J–2 at 61–62.) Dr. Bowes also admitted that a ban on the D & X would prevent the medical community from eventually learning whether the procedure in fact has safety advantages. (*Id.*)

from the attending physician and two consulting physicians that the "continuation of the pregnancy is likely to result in the death of the woman or substantially and irremediably impair the mental or physical health of the woman." Va.Code Ann. § 18.2–74. This means that, except for the abortions proscribed by the Act, the universe of post-viability abortions in Virginia is already limited to those in which there is a health risk. As Chief Judge Posner observed after examining a similar scheme in Wisconsin, "[t]hese are precisely the cases in which it is most important for the woman's health that the physician have the maximum latitude to choose the procedure that is best in the particular circumstances." *Doyle*, 162 F.3d at 468.

Without a health exception, the Act, even when narrowly construed, flouts this common-sense proposition and forces maternal health to take a backseat in some instances to State interests in morality and in fetal life. But, in fact, there is no rational interest in fetal life because "[t]he only fetuses whom the statute will save are those whose mothers are afraid for reasons of health to undergo an alternative procedure to partial birth abortion." *Id.* at 471. Nor can the Commonwealth's interest in regulating morality permit it to pose a risk of such unknown magnitude to the health of its pregnant women.

Because the Act lacks a "health exception" it runs afoul of *Roe* and *Casey* and, for this additional reason, it is unconstitutional. This conclusion finds support in the decisions of other courts to have considered partial birth abortion legislation similarly lacking a maternal health excep-

tion. *See, e.g., Doyle*, 162 F.3d at 467–71; *Foster*, 43 F.Supp.2d at 613–14; *Miller*, 30 F.Supp.2d at 1167–68; *Verniero*, 41 F.Supp.2d at 501–02; *Butterworth*, 54 F.Supp.2d at ————, No. 98–0774, slip op. at 19–20; *Jegley*, No. LR–C–97–581, slip op. at 51–61; *Hope Clinic*, 995 F.Supp. at 861; *James*, 984 F.Supp. at 1455; *Woods*, 982 F.Supp. at 1378.

■ Additionally, the Court notes its agreement with those other courts which have concluded that legislation similar to the Act is flawed because the statutory exception for the life of the mother is constitutionally inadequate. The Supreme Court in *Casey* reaffirmed the holding in *Roe* that the State, in furtherance of its interest in potential life, may "regulate, and even proscribe, abortion except where it is necessary, *in appropriate medical judgment*, for the preservation of the life or health of the mother." *Casey*, 505 U.S. at 879, 112 S.Ct. 2791 (quoting *Roe*, 410 U.S. at 164–65, 93 S.Ct. 705) (emphasis added). The Act's life exception, meanwhile, allows for a "partial birth abortion" only if "necessary to save the life of a mother." Va.Code Ann. § 18.2–74.2(A). As other courts have recognized, "[t]his 'necessary' language does not protect the physician's ability to make a judgment call as required by *Roe*." *Verniero*, 41 F.Supp.2d at 503; *see Foster*, 43 F.Supp.2d at 614; *Miller*, 30 F.Supp.2d at 1168; *Butterworth*, 54 F.Supp.2d at —————, No. 98–0774, slip op. at 19. The Act's life exception is, therefore, only a "qualified" one, which provides an independent basis for ruling that the Act is unconstitutional.[62]

62. The Act's life exception also appears constitutionally problematic for another reason. In a recent article, Professor Alan Michaels describes Supreme Court jurisprudence as subscribing to a principle he calls "constitutional innocence," whereby "strict liability is constitutional when, but only when, the intentional conduct covered by the statute could be made criminal by the legislature. In other words, strict liability runs afoul of the Constitution if the other elements of the crime, with the strict liability element excluded, could not

themselves be made a crime." Alan C. Michaels, *Constitutional Innocence*, 112 Harv. L.Rev. 828, 834 (1999). Turning to the Act, Professor Michaels states that it is not clear whether the Act's "knowing" requirement applies to the element of "not necessary to save the life of a mother." (Section 18.2–74.2(A) provides: "[A] physician shall not knowingly perform a partial birth abortion that is not necessary to save the life of a mother.") Professor Michael argues that, under the principle of "constitutional innocence," strict liabil-

## C. CONCLUSION: AS TO *ROE* AND *CASEY* ANALYSIS

In this facial challenge to the Act, the Plaintiffs have proven that *Casey*, and not *Salerno*, supplies the applicable standard of review. On the merits, the Court concludes that the Act unconstitutionally intrudes upon the fundamental abortion right in two significant respects. First, by virtue of its scope, the Act places a "substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" in a "large fraction" of the cases in which it is implicated. *Casey*, 505 U.S. at 877, 895, 112 S.Ct. 2791. It, therefore, constitutes an undue burden. Second, the Act runs afoul of the law governing State regulation of post-viability abortions, because it proscribes "partial birth abortions" without an exception for procedures that are "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 879, 112 S.Ct. 2791 (quoting *Roe*, 410 U.S. at 164–65, 93 S.Ct. 705).

## IV. VOID FOR VAGUENESS

In addition to mounting a challenge under *Roe* and *Casey*, Plaintiffs claim that the Act is so vague that it is incapable of passing constitutional muster. "[E]ven if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, —— U.S. ——, ——, 119 S.Ct. 1849, 1857, 144 L.Ed.2d 67 (1999) (plurality opinion); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process."). As Justice Stevens recently explained for the plurality in *Morales*, vagueness may invalidate a criminal law for either of two independent reasons. "First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Id.* at ——, 119 S.Ct. at 1859 (citing *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). Plaintiffs' vagueness challenge proceeds on the first basis identified by the *Morales* plurality. Specifically, Plaintiffs contend that the Act fails to provide physicians with fair notice of what it proscribes.

This facet of the void-for-vagueness doctrine embodies the cardinal principle of due process that a criminal statute must provide adequate notice to a person of ordinary intelligence that his contemplated conduct is legal because "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954). Of course, application of this principle is by no means mechanical because "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates*, 455 U.S. at 498, 102 S.Ct. 1186. To that end, two refinements are significant in evaluating the Act. First, where a statute imposes criminal penalties,

---

ity with regard to the Act's life exception would be unconstitutional because the life exception is essential to the State's ability to prohibit partial birth abortions. *See id.* at 876 n. 264.

The Court agrees with Professor Michael that it is not readily apparent from the language of the Act whether the Act's scienter element modifies its life exception. But, given the Act's other constitutional defects, the ramifications of that ambiguity need not be addressed further.

the consequences of imprecision are more severe and the standard of certainty that due process requires is correspondingly higher. *See Kolender,* 461 U.S. at 358 n. 8, 103 S.Ct. 1855; *Village of Hoffman Estates,* 455 U.S. at 498–99, 102 S.Ct. 1186. Also significant for present purposes is that the required degree of clarity is particularly stringent "where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Colautti v. Franklin,* 439 U.S. 379, 391, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979).[63]

■■■ These established guideposts must govern the assessment of the Plaintiffs' vagueness challenge to the Act. Equally important, of course, is that the analysis be conducted mindful of the principles of federalism which are at the core of our constitutional government. Fealty to those concerns requires that the Plaintiffs here must demonstrate the existence of real, rather than fabricated, vagueness in the statute whose enforcement they seek to enjoin. That is especially important where a federal court is called upon to strike what the people of a State have wrought by their duly elected officials. *See Planned Parenthood of the Blue Ridge*

*v. Camblos,* 155 F.3d 352, 383 (4th Cir. 1998) (en banc), *cert. denied,* —— U.S. ——, 119 S.Ct. 1031, 143 L.Ed.2d 40 (1999). In this case, the Plaintiffs have carried their burden in establishing that the Act is void for vagueness.

First, the defined term "partial birth abortion" as a whole is vague. That phrase lacks any medical meaning, and no such term has even been used in any medical text or medical journal.[64] Defendants have asserted repeatedly throughout this litigation, by way of written briefs, oral argument, and sworn affidavits, that the term refers just to the D & X procedure and not suction·curettage abortions, drug-induced abortions, or "conventional D & E abortions" (as the Defendants define them). And, of course, the interpretation of the prosecuting attorneys is a factor to be considered in assessing the vagueness of a statute. *See Forsyth County v. The Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). But that principle has its limits. To that end, it is significant that, in their affidavits and pleadings, the Defendants are unable ·to define the D & X procedure with terminology drawn from the Act's definition of "partial birth abortion."[65] Instead, the

**63.** The Supreme Court has recognized that the "more important aspect" of the void-for-vagueness doctrine is not its notice prong, but rather the requirement that a legislature establish minimal guidelines to govern law enforcement. *Kolender,* 461 U.S. at 358, 103 S.Ct. 1855. But, in the context of the Act, these two concerns merge. As will be seen, the Act does not provide physicians with adequate notice. From this, it may be inferred that law enforcement officials and prosecutors—who, unlike the Plaintiffs, generally are not trained in obstetrics—likewise are left adrift when it comes to ascertaining the Act's reach. *Accord United States v. Gaudreau,* 860 F.2d 357, 359 (10th Cir.1988) (in void-for-vagueness review "[t]he same facets of a·statute usually raise concerns of both fair notice and adequate enforcement standards").

**64.** (*See* AMA Report at 15; Fitzhugh Decl. ¶ 19; Jones Decl. ¶ 22; deProsse Decl. ¶ 67; Hausknecht Decl. ¶ 29); *see also Woods,* 982 F.Supp. at 1379–80 (concluding that "partial birth abortion" was not medically accepted

term); *Evans,* 977 F.Supp. at 1305 (finding that the term "partial-birth abortion" is not one found in the medical literature).

**65.** For example, in the Attorney General's April 30 letter to Senator Newman, he states that the D & X procedure is one which "involves delivering all but the head of the intact living fetus into the vagina, followed by 'partial evacuation of the intracranial contents with suction' so as to cause death and compress the skull before completion of the delivery." (Defs.' Ex. Q (quoting *Evans,* 977 F.Supp. at 1293).) The Commonwealth's Attorneys adopt a similar definition of the allegedly "banned" procedure, stating that a D & X "means an abortion procedure or technique 'in which the physician, rather than removing the fetus in parts, removes it from a breech position intact up to the head, and then, if necessary, reduces the size of the head (by collapsing the calvarium using forceps or by evacuating it contents using suction) to remove the intact fetus the rest of the way.'"

Defendants employ, with considerable selectivity, parts of the descriptions used by the AMA Report and by ACOG, though those definitional efforts are decidedly more precise than those parts on which the Defendants rely.

Also significant are the Defendants' repeated assertions, on the one hand, that the term "partial birth abortion" is clear and unambiguous, while simultaneously maintaining, with the next breath, that the Act proscribes not just the D & X but also variations of it "including those that may be as-yet unidentified and/or uninvented." (Stmnt.Comm. at 4.) The record here shows clearly that, in the medical community, the D & X procedure performed by Dr. Haskell is itself but a variation of the D & E method of abortion, the most common second trimester abortion technique. The Act, therefore, prohibits some part of clearly protected constitutional activity, but no one—not even those charged with enforcing it—know its precise contours. Indeed, not until the post-trial oral argument in January of this year, after over seven months of litigation and countless opportunities past, did counsel for the Defendants finally assert their (erroneous) belief that the Act does not cover the abortion procedures performed by Drs. Jones and Fitzhugh. (Tr.2d at 110.) Moreover, at the same oral argument, counsel again was unable to specify which "variations" of the D & X the Commonwealth has retained the authority to prosecute under the Act's definition of "partial birth abortion." (Tr.2d at 74.) Given the potential variations in abortion procedures that may be necessitated by the physician's preference under a given set of circumstances, or by the woman's condition, or both, these uncertainties underscore the Act's propensity to criminalize without fair warning.

Defendants contend that any purported vagueness is dissipated when the Act is read *in toto*, because the Act's definition of "partial birth abortion" limits its scope to those abortion procedures performed in a prescribed sequence. Section 18.2–74.2(D) defines "partial birth abortion" as an abortion in which the physician "deliberately and intentionally delivers a living fetus or a substantial portion thereof into the vagina for the purpose of performing a procedure the person knows will kill the fetus, performs the procedure, kills the fetus and completes the delivery." Considering this statutory language against the record respecting abortion procedures, the Court has found already (with some hesitation) that the Defendants' "sequencing" interpretation is a reasonable one and entitled to deference. *See supra* Part II.B.2. That, however, does not put the vagueness issue to rest. Persons of "ordinary intelligence"—the physicians at whom the Act is directed—will not always have access to the Commonwealth's seventeen-page official interpretation when they endeavor to grasp the Act's proscriptive reach. The Defendant's "sequencing" construction certainly is not found in the text of the Act, and it is not otherwise readily apparent. Meanwhile, several aspects of the Act's definition of "partial birth abortion" reasonably can be construed to cover far more than the D & X procedure described by Dr. Haskell.

For example, the Act requires as a predicate to criminal liability that the fetus or a substantial portion thereof be "deliver[ed] ... into the vagina." The term "delivery" is given broad meaning in obstetrics. And the record reflects that, with the exception of surgical alternatives, in all abortions at least part of the fetus is delivered into and through the vagina. Defendants claim, however, that what distinguishes the conduct prohibited by the Act is that the Act only prohibits those deliveries into the vagina "for the purpose of performing a procedure the person knows will kill the fetus." The problem with this statutory limitation is that it too

(Defs.' Exs. R–1 to R–6 ¶ 4(e) (quoting *Evans,* 977 F.Supp. at 1293).) The language used by

the Attorney General and by the Commonwealth's Attorneys does not appear in the Act.

is vague. First, one must assume that the Act's use of the word "procedure" in this "purpose" phrase denotes something other than the entire abortion procedure. (Otherwise, the Act would prohibit virtually all abortions.) Even then, the statute does not define the act that the word "procedure" purportedly signifies. The Defendants contend that "partial evacuation of the intracranial contents of the living fetus" constitutes the forbidden "sub-procedure," (AMA Report at 15), but they deny that severing a part of the umbilical cord after a part of the fetus is outside the uterus, or removing a limb of the fetus by traction against the cervix qualifies as such. Nothing in the Act itself supports this distinction. In fact, physicians are left to speculate as to what the the Act means by "procedure."

The Defendants justify their construction of this word by explaining that the Act contemplates only those "sub-procedures" that the physician "knows will kill the fetus" and that, once "perform[ed]," do in fact "kill[ ] the fetus." Va.Code Ann. § 18.2–74.2(D). Defendants contend that the statutory phrase "kills the fetus" means actual death, an immediate effect of the "sub-procedure." Implicit in this construction, but not present in the statute, is a location requirement. Only if the physician performs the "sub-procedure" that "kills the fetus" while the fetus (or a substantial portion thereof) is in the vagina does the word "procedure" in the Act mean what the Defendants say it means. But one ambiguous phrase cannot clarify another.

Furthermore, even allowing this interpretative gloss, the Act is both overbroad and under-inclusive when considered in connection with the Defendants' stated intention of proscribing just the D & X. Under the Defendants' interpretation of

"kills the fetus," the Act would cover those D & E procedures in which a disarticulated limb causes death by exsanguination while part of the fetus is still in the vagina. Meanwhile, under the same interpretation, the Act would not cover the slight variation of the Haskell D & X whereby the physician achieves fetal demise by crushing the cranium rather than suctioning its contents.[66] And, the foregoing all assumes, of course, the existence of some clearly established criteria for assessing when fetal death occurs during an abortion. In fact, none exists. Physicians do know, however, that certain steps taken during a pre-viability abortion (like disarticulation of fetal extremities, compression of the fetal skull, or severing the umbilical cord) will inevitably result in fetal demise.

The phrases "delivers . . . into the vagina," "performs the procedure," and "kill the fetus" thus all suffer from gross imprecision because they are not grounded in the realities of abortion practice. The Act's central vagueness problem lies not with these terms, however. Instead, it is the terminology used to define the object of the Act—"living fetus or a substantial portion thereof"—that has engendered the most controversy in this litigation and that provides the least notice to Virginia physicians seeking to conform their conduct to law.

In medical terms, a "living fetus" is one which evinces a heartbeat, at a specified rate, for a certain period of time, a circumstance that occurs at about ten weeks lmp. The Defendants argue that "living fetus" in the Act implies intactness, but the statute contains no such limitation. Moreover, the record establishes that a fetus may be "living," i.e., have a heartbeat, despite disarticulation. (Tr. at 59–60, 141.) The term "living fetus" is thus susceptible of at least two interpretations,[67] an ambiguity

**66.** The Defendants' own witness, Dr. Giles, explained that crushing the fetal skull to facilitate removal from the woman's body does not necessarily cause immediate fetal death.

(Tr. at 405–06.) Dr. Stubblefield expressed a similar view. (Pls.' Ex. 4A at 46–47.)

**67.** Other courts have questioned the meaning of the term "living fetus" on an even more

compounded by the remainder of the disjunctive phrase "living fetus or a substantial portion thereof." As the district court in New Jersey observed of similar language in that state's "partial-birth abortion" ban:

> The "substantial portion" language only compounds the vagueness problem. Use of "substantial portion thereof" feeds confusion about whether the fetus must be intact. That is, the phrase may be read to require whole or partial delivery into the vagina of an intact living fetus. Conversely, the language may be read to provide for the situation where a "substantial portion" of the fetus is delivered into the vagina, disarticulated from the remainder of the fetus which remains in the uterus with a heartbeat.

*Verniero,* 41 F.Supp.2d at 493; *see also Miller,* 30 F.Supp.2d at 1165. These observations have clear pertinence here. If "living fetus or a substantial portion thereof" is read to apply to disarticulated fetal parts, then the Act would proscribe even early D & E abortions where disarticulation occurs *in utero.* Given the Act's criminal penalties, this uncertainty may cause some physicians to "steer far wider of the unlawful zone." *Grayned v. City of Rockford,* 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (citation omitted).

Moreover, the phrase "substantial portion thereof" is irredeemably vague even if one implies an otherwise intact fetus. Unlike the other terms in the Act, some of which may have a generally accepted medical meaning but are ambiguous in context, the phrase "substantial portion" is entirely foreign to obstetrics. Simply put, the record demonstrates that no one knows what constitutes a "substantial portion" of a living fetus. Plaintiff and defense experts alike have struggled with the term and its limits. Some have endeavored to define the term by identifying those body parts included. For example, Dr. Stubblefield opined that an extremity or a fetal head constitutes a "substantial portion." (Pls.' Ex. 4A at 69–70). Other witnesses, meanwhile, have defined the phrase in terms of some percentage or fraction of the fetal body. Defense witness Dr. Aultman, for example, asserted that "substantial portion" must be at least ⅓ of the fetus. Dr. Aultman conceded, however, that "substantial" could just as easily be construed as 25% of the fetus, or 35%. (P.I.Tr. at 282.) The Act provides no indication as to whether physicians are to equate "substantial portion" with specific body parts, or instead with percentages of the size or weight or length of the fetal body.

One defense witness, Dr. Bruchalski, distinguished between two types of "substantiality." If "substantial portion" is considered in a qualitative sense, according to Dr. Bruchalski, any portion of the fetus—even a hand—is substantial. (Defs.' Ex. L at 27.) If, on the other hand, "substantial portion" implies some quantitative assessment of the volume of the relevant portion, then only the head, torso, abdomen and pelvis would qualify as "substantial portions." (*Id.*) Dr. deProsse also expressed this sort of confusion with the phrase "substantial portion." (Tr. at 156.) On the issue of whether the term "substantial portion" is used in the quantitative or qualitative sense, the Act once again provides no guidance.[68]

---

fundamental level. For example, in *Woods,* the district court queried as follows: "Does 'living fetus' under the Act refer to the presence of a fetal heartbeat? Alternatively, does 'living fetus' refer to living cells? As demonstrated by the testimony in this case, reasonable physicians differ as to the meaning of what is 'living'." 982 F.Supp. at 1379.

**68.** The witnesses are not the only ones to have grappled with the meaning of "substantial portion thereof" during the pendency of this litigation. Even Defendants' counsel harbor similar concerns respecting the term's vagueness, as seen in the following excerpt from the deposition of Defendants' witness Dr. Boehm:

> Q. [By PLAINTIFFS' COUNSEL] In your opinion, is a leg a substantial portion of a fetus?
> [DEFENSE COUNSEL]: Objection; vague.
> A. No.
> Q. In your opinion, is an arm a substantial portion of a fetus?

Other courts have found the "substantial portion" language in similar partial birth abortion legislation to be fatally vague. *See, e.g., Miller,* 30 F.Supp.2d at 1165; *Verniero,* 41 F.Supp .2d at 493–94. Indeed, that is the precise holding in *Carhart v. Stenberg,* 11 F.Supp.2d 1099 (D.Neb. 1998), which involved Nebraska's "partial birth abortion" ban. In *Carhart,* "[e]very doctor who testified, including the defense experts, stated that they did not understand the outer limits of the term or the term could be interpreted in vastly different ways by fair-minded people." *Id.* at 1131. The court concluded that Nebraska's law was void for vagueness because, and only because, "the words 'substantial portion' are so vague as to be meaningless to doctors, lay people and prosecutors alike." *Id.* at 1132.

*Carhart's* analysis applies equally in this case. The phrase "substantial portion thereof" describes the minimum aspect of a fetus, the presence of which in the vagina triggers the Act's proscriptions. Because the remainder of the Act depends on this phrase for its meaning, the words "substantial portion thereof" are the linchpin to criminal liability under the Act. The record here is that those words are vague beyond redemption. As discussed previously, many abortions are accomplished by drawing some portion of the fetus through the cervix and into the vagina. And, while some of these procedures performed at later gestations do in fact fall within the Act's prohibitive sweep, *see supra* Part II.B.2, the Act's "substantial portion" language has the effect of rendering many more physicians (who are not trained in statutory interpretation) incapable of knowing precisely whether their conduct crosses the line from constitutionally protected to criminally prohibited. Where vagueness infects such an essential statu-

tory term, that is sufficient, without more, to render the entire enactment void for vagueness. *See Carhart,* 11 F.Supp.2d at 1131 n. 47. Independent of its impermissible overbreadth, then, the Act "presents serious problems of notice," not to mention problems of "discriminatory application[ ] and chilling effect on the exercise of constitutional rights." *Colautti,* 439 U.S. at 394, 99 S.Ct. 675.

Defendants argue that the Act's mens rea requirements cure it of any ambiguity. And of course, as the Supreme Court has explained, a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed. *See Village of Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. 1186. For example, in *Colautti v. Franklin,* the Supreme Court found an abortion statute's vagueness compounded by its lack of a scienter requirement. But, the Court in *Colautti* was clear that the addition of a mens rea element would not have been dispositive: "The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of a crime which is in some respects uncertain." 439 U.S. at 395 n. 13, 99 S.Ct. 675 (quoting *Screws v. United States,* 325 U.S. 91, 101–02, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)). This important qualification is necessary if the void-for-vagueness doctrine is to have any teeth at all. Indeed, a contrary view would suggest that a legislature may avoid vagueness challenges altogether by simply including a scienter requirement in every enactment. *See Verniero,* 41 F.Supp.2d at 495.

Not surprisingly, then, there are recognized limitations regarding a statutory scienter requirement as some sort of cure-

[DEFENSE COUNSEL]: Objection; vague.
A. No.
Q. In your opinion, are two legs a substantial portion of a fetus?
[DEFENSE COUNSEL]: Objection; vague.
A. No.

Q. In your opinion, is the head of the fetus a substantial portion?
[DEFENSE COUNSEL]: Objection; vague.
A. Again, no . . . .
(Defs.' Ex. K–2 at 74–75.)

all or antidote in the context of a vagueness challenge. *See, e.g., Sewell v. Georgia,* 435 U.S. 982, 987–88, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978) (Brennan J., dissenting) (remarking that scienter requirement should not save an otherwise unconstitutionally vague statute where requirement "provides no reasonable assurance that persons will know or ought to know when they are likely to violate" the statute); *United States v. Corrow,* 119 F.3d 796, 804 n. 11 (10th Cir.1997) ("We do not say that a scienter requirement alone will rescue an otherwise vague statute, recognizing 'it is possible willfully to bring about certain results and yet be without fair warning that such conduct is proscribed.' ") (quoting 1 W. LaFave & A. Scott, Jr., *Substantive Criminal Law* § 2.3, at 131 (1986)), *cert. denied,* ── U.S. ──, 118 S.Ct. 1089, 140 L.Ed.2d 146 (1998); *Nova Records, Inc. v. Sendak,* 706 F.2d 782, 789 (7th Cir.1983) ("A scienter requirement cannot eliminate vagueness . . . if it is satisfied by an 'intent' to do something that is in itself ambiguous."). These statements follow from the principle, recognized by our own Court of Appeals, "that when the law is vague or highly debatable, a defendant— actually or impliedly—lacks the requisite intent to violate it." *United States v. Critzer,* 498 F.2d 1160, 1162 (4th Cir.1974).

Against this backdrop, it is apparent that the Act's scienter requirements (that the partial birth abortion be "knowing[ ]," Va.Code Ann. § 18.2–74.2(A); that the delivery into the vagina be "deliberate[ ] and intentional[ ]," *id.* § 18.2–74.2(D); and that the delivery be "for the purpose of performing a procedure the person knows will kill the fetus," *id.*) have little overall impact upon the vagueness analysis. All three modify otherwise vague terms in the Act, and they do not render the Act's vague language any more certain. Thus, the scienter requirements fail to provide physicians subject to the Act's criminal penalties with any more notice of what is forbidden.[69]

The conclusion that the Act is impermissibly void-for-vagueness notwithstanding its scienter requirements finds support in the decisions of those other courts to have assessed partial birth abortion legislation which, like Virginia's, was modeled after the 1997 federal effort and contained similarly strong mens rea language. *See Miller,* 30 F.Supp.2d at 1164–66 (summary judgment and permanent injunction against Iowa statute); *Verniero,* 41 F.Supp.2d at 490–96 (permanent injunction against New Jersey statute); *Carhart,* 11 F.Supp.2d at 1131–32 (permanent injunction against Nebraska statute); *Brancazio v. Underwood,* No. 2:98–0495, slip op. at 3 (S.D.W.Va. June 11, 1998) (temporary restraining order against West Virginia statute). This conclusion also is bolstered by the decisions involving vagueness challenges to partial birth abortion statutes that, though not modeled after the 1997 federal bill, nonetheless contained language similar to that appearing in the Act.

---

**69.** In addition, it is not clear whether the mens rea requirements would be capable of adding anything of substance to the Act when considered against the record respecting actual abortion practice. For example, the "knowing[ ]" requirement modifies all aspects of the defined term "partial birth abortion," *see United States v. Wilson,* 133 F.3d 251, 260–62 (4th Cir.1997), but the record establishes that, during the course of an abortion procedure, the physician performing the abortion "delivers," "performs the procedure," "kills the fetus," and "completes the delivery" consciously and intentionally and not because of ignorance, accident, or mistake. Furthermore, the phrase "deliberately and intentionally"—a mens rea new to the Virginia Code—

adds little substance to the Act, particularly in the context of later-term D & E abortions. *See Carhart,* 11 F.Supp.2d at 1130; (*see also* Tr. at 55–59, 145; Pls.' Ex. 4A at 47–48; P.I.Tr. at 65–68, 75–78.) As Dr. deProsse succinctly stated, "Everything I do in an abortion is done with intention and deliberateness." (Tr. at 195.) And finally, the phrase "for the purpose of performing a procedure the person knows will kill the fetus" can be read to encompass an intention to effectuate partial delivery of a fetus part followed by any one of a number of so-called "sub-procedures," including severing the umbilical cord, avulsing a fetal limb, or compressing the cranium to facilitate removal from the woman's body.

See *Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 469–70 (7th Cir.1998) (directing district court to enter preliminary injunction against Wisconsin statute); *Causeway Medical Suite v. Foster*, 43 F.Supp.2d 604, 615–19 (E.D.La.1999) (permanent injunction); *A Choice for Women v. Butterworth*, 54 F.Supp.2d 1148, —— ——, No. 98–774, slip op. at 20–24 (S.D.Fla.1998) (same); *Little Rock Family Planning Servs., P.A. v. Jegley*, No. LR–C–97–581, slip op. at 37–43 (E.D.Ark. Nov. 13, 1998) (same); *Intermountain Planned Parenthood v. Montana*, No. 97–477, slip op. at 7–11 (D.Mont. June 29, 1998) (same); *Hope Clinic v. Ryan*, 995 F.Supp. 847, 853–56 (N.D.Ill.1998) (same); *Planned Parenthood v. Woods*, 982 F.Supp. 1369, 1378–79 (D.Ariz.1997) (same); *Evans v. Kelley*, 977 F.Supp. 1283, 1304–11 (E.D.Mich.1997) (same); *see also Women's Med. Prof. Corp. v. Voinovich*, 911 F.Supp. 1051, 1063–67 (S.D.Ohio 1995) (finding Ohio's ban on "Dilation and Extraction" unconstitutionally vague because its definition included the D & E abortion procedure), *aff'd*, 130 F.3d 187, 198–200 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496; *cf. Summit Med. Assoc., P.C. v. James*, 984 F.Supp. 1404, 1437–38 (M.D.Ala.1998) (certifying questions to state supreme court regarding what abortion procedures Alabama's partial birth abortion ban reaches); *Planned Parenthood of Alaska, Inc. v. Alaska*, No. 3AN–97–6019, slip op. at 6–12 (Alaska Super.Ct. Mar. 13, 1998) (permanent injunction against Alaska statute under Alaska State Constitution). *But see Planned Parenthood of Wis. v. Doyle*, 44 F.Supp.2d 975 (W.D.Wis.1999) (dismissing complaint in challenge to Wisconsin statute, but staying order pending appeal).

In sum, due in large part due to its "substantial portion" language, but also due to the other imprecise terms used to define "partial birth abortion," the Act leaves the ordinary physician without notice of what is illegal and incapable of conforming his or her conduct to law. Such a result is contrary to a central tenet of our Constitution: "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Morales*, —— U.S. at ——, 119 S.Ct. at 1860 (plurality opinion) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939)). Accordingly, the Act is void for vagueness and therefore unconstitutional for this additional reason.

## V. CONCLUSION

Having considered the pleadings, the affidavits, the evidence at the preliminary injunction hearing and at trial, and the arguments of counsel, and for the foregoing reasons, the Court concludes, as a matter of law on the facts of record, that the Plaintiffs have standing to maintain this action and that, on the merits, the Act violates the Due Process Clause of the Fourteenth Amendment in two respects. First, the Act impermissibly infringes upon the fundamental right to choose an abortion because it imposes an undue burden on that right and because it contains no health exception and an inadequate life exception. Second, the Act is impermissibly void for vagueness because it fails to provide adequate notice to those subject to its strictures of the conduct it prohibits. Because either of these grounds alone is sufficient to invalidate the Act, the Court need not consider Plaintiffs' additional argument that the Act discriminates against women on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment.

Accordingly, the Court orders that the Plaintiffs' request for declaratory relief be, and hereby is, GRANTED, and that the Virginia Partial Birth Abortion Act, Va. Code Ann. § 18.2–74.2 is declared unconstitutional on its face. Furthermore, the Court orders that the Plaintiffs' request for injunctive relief is GRANTED, and that the Defendants, their employees,

agents, and successors are hereby enjoined from enforcing Va.Code Ann. § 18.2–74.2.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.